No. 19-70022

In the
# United States Court of Appeals
## for the Fifth Circuit

RODNEY REED,

*Plaintiff-Appellant*,

v.

BRYAN GOERTZ,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Western District of Texas, No. 1:19-cv-794,
Hon. Lee Yeakel, *United States District Judge*

## PLAINTIFF-APPELLANT RODNEY REED'S SUPPLEMENTAL BRIEF

Cliff C. Gardner
Michelle L. Davis
Nicole A. DiSalvo
Gregory P. Ranzini
Peyton V. Carper
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King St.
Wilmington, DE 19801

Barry C. Scheck
Jane Pucher
THE INNOCENCE PROJECT
40 Worth St., Ste. 701
New York, NY 10013

Parker Rider-Longmaid
  *Counsel of Record*
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

Andrew F. MacRae
MACRAE LAW FIRM PLLC
3267 Bee Cave Rd., Ste. 107, PMB 276
Austin, TX 78746

*Counsel for Plaintiff-Appellant Rodney Reed*

## CERTIFICATE OF INTERESTED PARTIES

**A.**    The case is No. 19-70022, *Reed v. Goertz*. The Appellant is Rodney Reed and the Appellee is Bryan Goertz.

**B.**    The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case:

- Chipman Brown Cicero & Cole, LLP

- MacRae Law Firm, PLLC

- Office of the Attorney General of Texas

- Skadden, Arps, Slate, Meagher & Flom LLP

- The Innocence Project

These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Dated: July 3, 2023                               */s/ Parker Rider-Longmaid*
                                                    Parker Rider-Longmaid

## REQUEST FOR ORAL ARGUMENT

The Court's May 23, 2023, order granting supplemental briefing indicates that the Court has taken Reed's request for oral argument under advisement. ECF No. 100-2. This appeal presents important questions of constitutional law in a capital case in which this Court and the Supreme Court have invested considerable judicial resources. Reed respectfully submits that oral argument would aid the Court in its decisionmaking process.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES.........................................................i

REQUEST FOR ORAL ARGUMENT................................................... ii

TABLE OF AUTHORITIES.................................................................. v

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

STATEMENT OF THE CASE.............................................................4

    A.    Factual background.........................................................4

    B.    Procedural background ....................................................8

ARGUMENT.........................................................................13

    A.    The due-process guarantee protects state-created liberty interests in proving one's innocence using newly discovered evidence, including access to DNA testing..............13

    B.    Article 64, as construed by the Texas Court of Criminal Appeals, violates the  due-process guarantee.............................19

        1.    The extratextual non-contamination requirement violates due process..............................................20

        2.    The CCA's construction of Article 64's exoneration requirement is unconstitutional..........................24

        3.    The CCA's construction of Article 64's unreasonable-delay requirement violates due process. ..................................................................27

        4.    Individually and collectively, the requirements of Article 64 violate due process. .............................30

    C.    The district court's reasoning and Goertz's arguments lack merit. .......................................................31

## TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION ....................................................................40

CERTIFICATE OF COMPLIANCE .....................................................41

CERTIFICATE OF SERVICE ...............................................................42

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. State,*
  831 A.2d 858 (Del. 2003) ..................................................................35

*Bay Area Laundry & Dry Cleaning Pension*
  *Trust Fund v. Ferbar Corp. of California,*
  522 U.S. 192 (1997)..........................................................................12

*Brady v. Maryland,*
  373 U.S. 83 (1963).............................................................. 7, 8, 26, 37

*Chambers v. Mississippi,*
  410 U.S. 284 (1973)...........................................................................25

*Cleveland Board of Education v. Loudermill,*
  470 U.S. 532 (1985)...........................................................................14

*Connecticut Board of Pardons v. Dumschat,*
  452 U.S. 458 (1981)...........................................................................13

*Cook v. Foster,*
  948 F.3d 896 (7th Cir. 2020) ...................................................... 36, 37

*Cooper v. Oklahoma,*
  517 U.S. 348 (1996)...................................................................... 15, 16

*Cox v. Louisiana,*
  379 U.S. 559 (1965)...........................................................................17

*District Attorney's Office for Third Judicial District v. Osborne,*
  557 U.S. 52 (2009)............................................................... 1, 2, 13, 14,
  .................................................................... 15, 16, 21, 22, 23,
  .................................................... 26, 30, 32, 34, 35, 38, 39

*Dossett v. State,*
  216 S.W.3d 7 (Tex. App. 2006) .................................................. 23, 24

*Doyle v. Ohio,*
  426 U.S. 610 (1976)...................................................................... 17, 28

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ex parte Reed*,
  271 S.W.3d 698 (Tex. Crim. App. 2008)............................................................4

*Ex parte Reed*,
  No. 10,961-11 (21st Dist. Ct. Dec. 17, 2021)..................................................7, 8

*Ex parte Reed*,
  No. WR-50,961-10 (Tex. Crim. App. June 28, 2023) ......................................7

*Ex parte Reed*,
  No. WR-50,961-11 (Tex. Crim. App. June 28, 2023) ......................................8

*Ex parte Young*,
  209 U.S. 123 (1908)........................................................................................11

*Federal Communications Commission v.*
  *Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)........................................................................................30

*Floyd v. Vannoy*,
  894 F.3d 143 (5th Cir. 2018) ..................................................................... 25, 26

*Frazier v. Garrison I.S.D.*,
  980 F.2d 1514 (5th Cir. 1993) ........................................................................14

*Garcia v. Castillo*,
  431 F. App'x 350 (5th Cir. 2011) (per curiam) ....................................... 37, 38

*Griffin v. California*,
  380 U.S. 609 (1965)........................................................................................28

*Gutierrez v. Saenz*,
  565 F. Supp. 3d 892 (S.D. Tex. 2021),
  *appeal pending*, No. 21-70009 (5th Cir.) .........................................................22

*Harvey v. Horan*,
  285 F.3d 298 (4th Cir. 2002) ..........................................................................26

*Herrera v. Collins*,
  506 U.S. 390 (1993)........................................................................................31

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hinton v. Alabama,*
    571 U.S. 263 (2014) (per curiam)......................................................36

*Holmes v. South Carolina,*
    547 U.S. 319 (2006).........................................................................25

*Jauch v. Choctaw County,*
    874 F.3d 425 (5th Cir. 2017) ...........................................................16

*Medina v. California,*
    505 U.S. 437 (1992)................................................... 14, 15, 16, 30

*Meinhard v. State,*
    371 P.3d 37 (Utah 2016) ..................................................................35

*Miranda v. Arizona,*
    384 U.S. 436 (1966)................................................... 17, 22, 23

*Napue v. Illinois,*
    360 U.S. 264 (1959).........................................................................18

*Parke v. Raley,*
    506 U.S. 20 (1992)...........................................................................15

*Pennsylvania v. Finley,*
    481 U.S. 551 (1987).........................................................................15

*Perry v. New Hampshire,*
    565 U.S. 228 (2012)................................................................ 19, 23

*Pruett v. Choate,*
    711 F. App'x 203 (5th Cir. 2017) .....................................................34

*Pruett v. State,*
    No. AP-77,065, 2017 WL 1245431
    (Tex. Crim. App. April 5, 2017).......................................................34

*Raley v. Ohio,*
    360 U.S. 423 (1959).........................................................................17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Reed v. Goertz,*
143 S. Ct. 955 (2023) ........................................................................ 2, 10, 11, 12,
.................................................................................... 14, 32, 33, 34, 38

*Reed v. Goertz,*
995 F.3d 425 (5th Cir. 2021) ................................................................10

*Reed v. State,*
541 S.W.3d 759 (Tex. Crim. App. 2017) ..............................................28

*Reed v. State,*
No. 73,135 (Tex. Crim. App. Dec. 6, 2000) .........................................5

*Reed v. Texas,*
140 S. Ct. 686 (2020) .......................................................... 1, 4, 5, 6, 7

*Reyes v. Nurse,*
38 F.4th 636 (7th Cir. 2022) ......................................................... 18, 19

*Santobello v. New York,*
404 U.S. 257 (1971) ...................................................................... 17, 18

*Skinner v. Switzer,*
562 U.S. 521 (2011) ...................................................... 12, 14, 32, 33

*Stovall v. Denno,*
388 U.S. 293 (1967) ...................................................................... 18, 19

*Strickland v. Washington,*
466 U.S. 668 (1984) ...................................................................... 36, 37

*United States v. Dvorin,*
817 F.3d 438 (5th Cir. 2016) ................................................................18

*United States v. Fasano,*
577 F.3d 572 (5th Cir. 2009) ......................................................... 22, 24, 32

*United States v. O'Keefe,*
128 F.3d 885 (5th Cir. 1997) ..............................................................18

*Utah v. Evans,*
536 U.S. 452 (2002) ............................................................................11

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wolff v. McDonnell*,
  418 U.S. 539 (1974) .......................................................................................16

*Zinermon v. Burch*,
  494 U.S. 113 (1990) .......................................................................................12

**STATUTES AND RULE**

18 U.S.C. § 3600(a)(4) ......................................................................................24

42 U.S.C. § 1983 ............................................................................. 2, 8, 10, 14

Cal. Penal Code § 1405(g)(2) ..........................................................................32

Fla. Stat. § 925.11(f)(2) ....................................................................................32

42 Pa. Cons. Stat. § 9543.1(d)(1)(ii) ...............................................................32

Tex. Code Crim. Proc. art. 11.071(5)(a)(1) ............................................. 2, 14, 21

Tex. Code Crim. Proc. art. 38.43(b) .................................................................21

Tex. Code Crim. Proc. art. 38.43(c)(2)(A) .......................................................21

Tex. Code Crim. Proc. art. 64 .............................................................. 1, 2, 3, 8, 9,
  ...................................................................................... 10, 11, 14, 19,
  ......................................................................... 20, 21, 22, 23, 24, 27,
  .................................................................... 29, 30, 31, 32, 33, 37, 38

  Tex. Code Crim. Proc. art. 64.01(a)(1) (2011)........................................ 29, 30

  Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii) ...........................................8, 21

  Tex. Code Crim. Proc. art. 64.03(a)(2)(A) .....................................................9

  Tex. Code Crim. Proc. art. 64.03(a)(2)(B) .....................................................9

Tex. R. Evid. 901(a)....................................................................................... 23, 24

**OTHER AUTHORITY**

41 C.J.S. Homicide § 216 (1991) ......................................................................25

## INTRODUCTION AND SUMMARY OF ARGUMENT

Rodney Reed has been fighting to prove his innocence—and save his life—for a quarter century. During that time, he has amassed "a considerable body of evidence" that he did not murder Stacey Stites. *Reed v. Texas*, 140 S. Ct. 686, 687, 690 (2020) (statement of Sotomayor, J., respecting the denial of certiorari). That evidence shows that Reed and Stites were intimately involved and that Stites' fiancé had motive and opportunity to kill Stites for having an affair with a Black man—and that he even confessed to doing so.

But Reed remains on death row, and District Attorney Bryan Goertz still refuses to let him DNA test critical crime-scene evidence, including the belt used to strangle Stites. Goertz has kept the evidence locked away even though—or perhaps because—"DNA testing has an unparalleled ability … to exonerate the wrongly convicted," *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 69 (2009), and has done just that in hundreds of cases. Although Reed's lawyers have offered to pay for testing, Goertz, relying on the Texas Court of Criminal Appeals' (CCA) authoritative construction of Texas' postconviction DNA-testing law, Article 64 of the Texas Code of Criminal Procedure, still says no.

The Supreme Court has now made clear not only that Reed's 42 U.S.C. § 1983 suit is timely, but that Goertz likely "would grant access to the requested evidence" "if a federal court concludes that Texas's post-conviction DNA testing procedures violate due process." *Reed v. Goertz*, 143 S. Ct. 955, 960 (2023). So the question of Article 64's constitutionality returns to this Court. And what Reed's plight makes clear is that Article 64, as authoritatively construed by the CCA, violates the Fourteenth Amendment's guarantee that "[n]o State shall … deprive any person of life" or "liberty" "without due process of law." Because Texas gives prisoners a substantive entitlement to prove their innocence with newly discovered evidence, *see* Tex. Code Crim. Proc. art. 11.071(5)(a)(1), Article 64 must provide due process, *Osborne*, 557 U.S. at 68-69. But Article 64 is "fundamentally inadequate to vindicate" that right because of the way the CCA has interpreted it. *Id.*

*First*, the non-contamination requirement the CCA added to Article 64's chain-of-custody requirement is fundamentally unfair because it bars prisoners from accessing DNA testing, no matter its reliability or the resulting unreliability to the truth-finding process of preventing it, based on the state's own insufficient procedures. Put simply, Article 64 makes a promise the state doesn't keep—even though *the state* can rely on DNA evidence no

matter the reliability concerns. *Second*, Article 64's requirement that favorable results would exonerate the prisoner is fundamentally unfair because it excludes consideration of posttrial developments and DNA results inculpating a third party. *Third*, the requirement that testing not be for the purpose of unreasonable delay arbitrarily punishes prisoners for litigating their innocence and requires them to have predicted that a new technology, touch-DNA testing, was available before Article 64 or the CCA said it was. Both individually and collectively, these three requirements leave even prisoners with strong evidence of innocence little hope of obtaining DNA testing. As construed by the CCA, Article 64 violates the due-process guarantee because it is an illusory promise fundamentally inadequate to vindicate a prisoner's liberty interest in proving his innocence.

Goertz's defense of Article 64 fails. Goertz claims chain-of-custody, exoneration, and unreasonable-delay requirements are common and constitutional. But he doesn't grapple with the CCA's construction of those requirements, which goes beyond Article 64's text and renders the DNA-testing law illusory. In fact, Goertz has not pointed to any decision upholding any of the requirements Reed challenges. The Court should reverse and remand.

## STATEMENT OF THE CASE

### A.    Factual background

**1.**    Reed has been on death row since 1998 for a crime he steadfastly maintains he did not commit: the murder of Stacey Stites. In 1996, Stites, a 19-year-old white woman, was found dead on the side of a country road. *Ex parte Reed*, 271 S.W.3d 698, 702 (Tex. Crim. App. 2008). Her fiancé, a white local police officer named Jimmy Fennell, was the last person known to have seen her alive. *Reed*, 140 S. Ct. at 686-87 (statement of Sotomayor, J.).

Fennell was an early suspect. *Reed*, 271 S.W.3d at 708. He "shared an apartment" with Stites and was supposed to drive her to work the day she went missing. *Id.* at 702. And when asked during polygraph tests "if he strangled, struck, or hit Stacey," he proved "deceptive." *Id.* at 738. Yet "authorities never made an effort to search [his] apartment." *Id.* at 708. Instead, police targeted Reed after finding sperm matching Reed's DNA inside Stites' vaginal tract. *Id.* at 705, 710. Reed, a Black man, protested his innocence, explaining that he and Stites were having an affair and that he didn't kill her. *Reed*, 140 S. Ct at 686 (statement of Sotomayor, J.).

At Reed's trial, the prosecution argued that Stites was killed while driving to work at around 3:00 a.m. Reporter's Record (RR) vol. 56, 60:7-

62:11, *State v. Reed*, No. 8,701 (21st Dist. Ct. May 18, 1998). The state also presented expert testimony that sperm remains intact inside a vaginal tract for no longer than 26 hours, so the sperm recovered from Stites' body must have been deposited no earlier than the night before. *Reed*, 140 S. Ct. at 687 (statement of Sotomayor, J.). "This evidence thus tended to inculpate Reed (by suggesting that he must have had sex with Stites very soon before her death) and exculpate Fennell (by indicating that Stites died after Fennell claimed to have seen her last)." *Id.*

An all-white jury convicted Reed and sentenced him to death. The CCA affirmed. *Reed v. State*, No. 73,135 (Tex. Crim. App. Dec. 6, 2000).

**2.**    **a.**    Over the last two decades, Reed has fought to prove his innocence in state and federal court. In doing so, he has developed a "considerable body of evidence" indicating that he is innocent. *Reed*, 140 S. Ct. at 687 (statement of Sotomayor, J.). For example:

- The pathologist who testified for the state at Reed's trial recanted his testimony about Stites's time of death and the likelihood of sexual assault. ROA.73-76.

- The agencies that employed the state's experts who testified that spermatozoa cannot survive for more than 24-26 hours inside the vaginal tract issued letters limiting and discrediting their trial testimony. ROA.83, 85-86.

- Fennell pleaded guilty to sexually assaulting a person in his police custody. ROA.169-70. An inmate with whom Fennell was later incarcerated came forward to say that Fennell confessed to murdering his fiancée because she was cheating on him with a Black man. ROA.620-22.

**b.** After the initial briefing before this Court concluded in March 2020, the state trial court held an evidentiary hearing addressing Reed's ninth subsequent state habeas petition. Factual developments from the evidentiary hearing strongly support Reed's claims of innocence. For example:

- Several of Stites' and Fennell's coworkers testified that Reed and Stites knew each other and were intimately involved around the time of her death. RR vol. 3, 138:24-139:16, 159:10-25, *Ex parte Reed*, No. 8,701 (21st Dist. Ct. 2021); *id.* vol. 4, 17:2-23, 35:3-19; *id.* 278:16-22; *id.* vol. 5, 12:23-13:11; *id.* vol. 9, 109:2-16. Their testimony undermines the state's theory that Reed and Stites were strangers who could not have had consensual sex, so Reed must have sexually assaulted Stites. *See Reed*, 140 S. Ct. at 686-87 (statement of Sotomayor, J.).

- Witnesses also testified that Stites and Fennell had a tumultuous, violent relationship. *E.g.*, RR vol. 3, 179:17-180:20, 181:15-185:13, *Reed*, No. 8,701 (21st Dist. Ct. 2021); *id.* vol. 4, 16:1-17:1; *id.* vol. 5, 10:20-12:12, 29:22-30:3. For example, Fennell's life insurance agent testified that Fennell told Stites, "If I ever catch you messing around on me, I will kill you and nobody'll know that I was the one that did it." *Id.* vol. 2, 308:22-309:12. Other witnesses testified about Fennell shouting at Stites, *id.* vol. 4 168:8-170:23; *id.* at 194:17-195:1; Fennell saying he knew Stites was having an affair with a Black man, *id.* vol. 2, 276:10-22; *id.* vol. 3, 47:16-48:19, 115:15-116:10; and Fennell making disparaging comments about Stites at her funeral, *id.* at 13:3-16; *id.* vol 4 234:16-235:1. This evidence tends to inculpate Fennell.

- Reed's and the state's experts agreed that the state's trial experts' testimony that spermatozoa can remain intact for only 24-26 hours was untrue. *Id.* vol. 2, 133:25-134:2; *id.* vol. 4, 88:17-89:10; *id.* vol. 8, 116:24-117:9, 120:8-122:16, 209:20-24, 280:14-21. The expert consensus undermines the state's theory that the spermatozoa recovered from Stites's body were deposited no earlier than the night before her death. *Reed*, 140 S. Ct. at 687 (statement of Sotomayor, J.).

- Reed also introduced expert testimony to show that the state's time-of-death window is at odds with post-mortem changes to Stites's body. RR vol. 8, 69:13-18, 70:22-71:2, *Reed*, No. 8,701 (21st Dist. Ct. 2021). The state's experts couldn't offer any medical evidence to support the window, either, *id.* at 206:3-22, 298:19-299:10, further undermining the state's theory that Reed killed Stites after she left the home she shared with Fennell around 3 a.m., *Reed*, 140 S. Ct. at 687 (statement of Sotomayor, J.).

**3.**    Reed has continued to litigate his innocence in Texas courts. Following the 2021 evidentiary hearing on Reed's ninth subsequent state habeas petition, the trial court adopted the state's proposed findings of fact and conclusions of law verbatim, *see* Findings of Fact, Conclusions of Law and Recommendations, *Ex parte Reed*, No. WR-50,961-10 (21st Dist. Ct., Oct. 31, 2021), ignoring Reed's objections, Suppl. RR vol. 13, 111:3-179:6, *Reed*, No. 8,701 (21st Dist. Ct. 2021). The CCA then dismissed the petition. *Ex parte Reed*, No. WR-50,961-10 (Tex. Crim. App. June 28, 2023).

Reed brought his tenth subsequent state habeas petition in December 2021, raising false-evidence claims and claims under *Brady v. Maryland*, 373

U.S. 83 (1963). *Ex parte Reed*, No. 10,961-11 (21st Dist. Ct. Dec. 17, 2021). The

CCA dismissed the petition without any opportunity for factfinding. *Ex parte*

*Reed*, No. WR-50,961-11 (Tex. Crim. App. June 28, 2023).

### B.    Procedural background

**1.**    Reed first sought DNA testing in 1999. ROA.172. In 2014, Reed

filed a motion in Texas trial court under Article 64, seeking to test key crime-

scene evidence, like the belt used to strangle Stites. ROA.278-79. The trial

court denied Reed's motion, ROA.206-222, and the CCA affirmed, ROA.271.

**2.    a.**    Reed then sued in federal court under 42 U.S.C. § 1983,

challenging Article 64 as authoritatively construed by the CCA. ROA.857.

Reed raised several constitutional claims, including a Fourteenth Amend-

ment due-process claim. *See id.* Reed's amended complaint sets out three

ways Article 64 violates due-process.

*First*, Reed explained that the requirement that the evidence "has been

subjected to a chain of custody sufficient to establish that it has not been sub-

stituted, tampered with, replaced, or altered in any material respect," Tex.

Code Crim. Proc. art. 64.03(a)(1)(A)(ii), is unconstitutional because the CCA

construed it to contain an extratextual "non-contamination" requirement.

That non-contamination requirement forecloses "relief to any person

- 8 -

convicted before rules governing the State's handling and storage of evidence were put in place," because it renders insufficient "the then-customary storage of evidence" and "the routine handling of such evidence by trial officials." ROA.177-78, 183-84.

*Second*, Reed explained that Article 64's requirement that the prisoner establish by a preponderance of the evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing," Tex. Code Crim. Proc. art. 64.03(a)(2)(A), is unconstitutional. As construed by the CCA, this exoneration inquiry permits consideration of discredited trial evidence while also prohibiting consideration of DNA-testing results inculpating a third party. ROA.186-88.

*Finally*, Reed explained that Article 64's requirement that "the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice," Tex. Code Crim. Proc. art. 64.03(a)(2)(B), is also unconstitutional. For one thing, the CCA's authoritative construction of this requirement permits a finding that a prisoner's "request for DNA testing was brought for an improper purpose" just because the inmate previously "litigate[d] his innocence based on other evidence." ROA.178-82. For another, it imposes an unfair hindsight

requirement by allowing later amendments to Article 64 to support a finding that a prisoner should have known earlier that certain testing was available. ROA.178, 187, 868 n.6.

**b.** The district court dismissed Reed's suit for failure to state a claim, asserting without analysis that "[t]here is nothing so egregious in Chapter 64 that rises to the level of a procedural due-process violation." ROA.869. This Court affirmed without reaching the merits on the ground that Reed's suit was untimely. *Reed v. Goertz*, 995 F.3d 425, 430-31 (5th Cir. 2021) (ECF No. 60).

**3.** The Supreme Court reversed. *Reed*, 143 S. Ct. at 961-62.

Reed argued that his § 1983 suit was timely because the statute of limitations didn't begin to run until the CCA denied rehearing. Reed Br. 24-39; 46-50, *Reed v. Goertz*, No. 21-442 (U.S.), available on docket at https://www. supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/21-442.html. Goertz responded that Reed's suit was untimely because it accrued when the Texas trial court denied Reed's Article 64 motion or, alternatively, when the CCA issued its initial decision. Goertz S. Ct. Br. 17-37. Goertz also challenged this Court's holding that it and the district court had jurisdiction over Reed's suit. According to Goertz, Reed lacked Article III

standing, Goertz was entitled to Eleventh Amendment immunity, and the *Rooker-Feldman* doctrine barred Reed's suit. Goertz S. Ct. Br. 37-44.

The Supreme Court reversed. *Reed*, 143 S. Ct. at 962. The Court began by agreeing with this Court that the federal courts have jurisdiction over Reed's suit. *Id.* at 960-61. *First*, on standing, the Court explained that Reed alleged an injury-in-fact—"denial of access to the requested evidence"—and that a federal court order finding Article 64 unconstitutional would create "'a significant increase in the likelihood'" that Reed would obtain DNA testing. *Id.* at 960 (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). The Court reasoned that an order holding that Article 64 violates due process "would eliminate the state prosecutor's justification for denying DNA testing," and that "[i]t is 'substantially likely' that the state prosecutor would abide by such a court order" and "grant access to the requested evidence." *Id.* (quoting *Evans*, 536 U.S. at 464).

*Second*, the Court rejected Goertz's sovereign immunity argument, reasoning that *Ex parte Young*, 209 U.S. 123, 159-61 (1908), "allows suits like Reed's for declaratory or injunctive relief against state officers in their official capacities." *Reed*, 143 S. Ct. at 960.

*Finally*, the Court held that *Rooker-Feldman* is no obstacle to Reed's suit. *Id.* at 960-61. "[A]s in *Skinner*," the Court explained, "Reed does 'not challenge the adverse' state-court decisions themselves, but rather 'targets as unconstitutional the Texas statute they authoritatively construed.'" *Id.* at 961 (quoting *Skinner v. Switzer*, 562 U.S. 521, 532 (2011)).

The Court next held that Reed's claim was timely because the statute of limitations did not begin to run until the CCA denied rehearing. *Id.* at 961-62. The Court explained that a statute of limitations generally "begins to run when the plaintiff has a 'complete and present cause of action.'" *Id.* (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). That analysis "focuses first on the specific constitutional right alleged to have been infringed." *Id.* And here, the Court continued, Reed's procedural due process claim required both a deprivation of liberty and "inadequate state process," meaning it was "'not complete when the deprivation occur[ed],'" but only "when 'the State fail[ed] to provide due process.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). The Court therefore concluded that "Reed's § 1983 claim was complete and the statute of limitations began to run when the state litigation ended — when the [CCA] denied Reed's motion for rehearing." *Id.*

**4.** Reed sought, and this Court granted, supplemental briefing on remand from the Supreme Court. ECF Nos. 75, 100. This brief follows.

## ARGUMENT

**A.  The due-process guarantee protects state-created liberty interests in proving one's innocence using newly discovered evidence, including access to DNA testing.**

**1.** When state law entitles prisoners to prove their innocence post-conviction using new evidence, due process requires the state to provide a fundamentally fair procedure for doing so. *Osborne*, 557 U.S. at 67-68. That requirement of a fair procedure applies to the state's process for providing access to DNA testing that can be used to prove innocence. *Id.*

To explain, the Fourteenth Amendment's Due Process Clause "imposes procedural limitations on a State's power to take away protected entitlements." *Id.* at 67. Thus, where state postconviction law gives a prisoner "a liberty interest in demonstrating his innocence with new evidence under state law," the due-process guarantee attaches, and the question is "what process (if any) is due." *Id.* at 67-68. That's because a "'state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.'" *Id.* at 68 (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981)). Put another way, even when the

Constitution does not provide a substantive legal entitlement, due process doesn't allow states to extend such entitlements with one hand and take them away with another. *See generally Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (because "substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures," state cannot limit constitutionally required process by how it defines the right); *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1529 (5th Cir. 1993).

These principles apply to Texas' procedures for prisoners seeking to prove their innocence through DNA evidence. Texas postconviction law gives prisoners a protected liberty interest in proving their innocence with new evidence. *See* Tex. Code Crim. Proc. art. 11.071(5)(a)(1). Texas thus must provide procedures adequate "to vindicate" that right. *Osborne*, 557 U.S. at 68-69; *see Skinner*, 562 U.S. at 525; *Reed*, 143 S. Ct. at 961. Prisoners therefore may challenge Article 64, as construed by the CCA, on due-process grounds under § 1983. *Skinner*, 562 U.S. at 530, 534; *Reed*, 143 S. Ct. at 961.

**2.**     A state's DNA-testing law provides inadequate process to vindicate a postconviction liberty interest if it "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental

fairness in operation.'" *Osborne*, 557 U.S. at 69 (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)).

To guide that assessment, courts look to "historical treatment" and "operation of the challenged rule," as well as Supreme Court precedents. *Medina*, 505 U.S. at 446. "Historical practice is probative of whether a procedural rule can be characterized as fundamental." *Id.* Contemporary practice also shows whether the state's practice is in step with that of other jurisdictions. *E.g.*, *Cooper v. Oklahoma*, 517 U.S. 348, 360-62 (1996) ("Only 4 of the 50 States" had similar procedures to Oklahoma's). But even if there is no historical or contemporary basis for concluding that the procedural rule violates due process, courts consider more broadly whether the operation of the rule is fundamentally fair. *Medina*, 505 U.S. at 448. That inquiry involves looking to analogous Supreme Court precedents, *see id.* at 449-52, and analogous federal laws, *see Parke v. Raley*, 506 U.S. 20, 33-34 (1992).

To be sure, "'when a State chooses to offer help to those seeking relief from convictions,' due process does not 'dictate the exact form such assistance must assume.'" *Osborne*, 557 U.S. at 69 (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987); brackets omitted). States instead have "more flexibility in deciding what procedures are needed in the context of

postconviction relief." *Id.*; *see Medina*, 505 U.S. at 445. But the due-process guarantee demands scrutiny for fundamental fairness all the same. Indeed, both the Supreme Court and this Court have found state laws unconstitutional applying *Medina*'s framework. *See Cooper*, 517 U.S. at 362-68 (requiring defendants to prove incompetence to stand trial by clear and convincing evidence violates due process); *Jauch v. Choctaw County*, 874 F.3d 425, 434-35 (5th Cir. 2017) (county's pretrial-detention procedure fundamentally inadequate to vindicate a suspect's substantive criminal-procedure rights).

3.    Supreme Court caselaw illustrates several ways state process can be fundamentally unfair, or arbitrary, and thus violate due process. Indeed, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). And in the context of state-created rights, the Supreme Court has explained that due process "entitle[s] [prisoners] to those minimum procedures appropriate under the circumstances … to insure that the state-created right is not arbitrarily abrogated." *Id.* at 557. Arbitrary state action depriving individuals of due process takes many forms, including breaking promises and using false evidence.

**a.**    The due-process guarantee requires states to keep their promises, because a process that breaks a promise is fundamentally unfair. For example, in *Doyle v. Ohio*, 426 U.S. 610, 619-20 (1976), the Supreme Court held that the government cannot use silence after *Miranda* warnings to impeach trial testimony. *See Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). The Court reasoned that although "*Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Doyle*, 426 U.S. at 618. Thus, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*

Similarly, in *Raley v. Ohio*, 360 U.S. 423, 437-39 (1959), the Court held that exercise of the promised right against self-incrimination cannot give rise to contempt. The Court described that "dece[ption]" or "active misleading" by the state—even unintentional—is "the most indefensible sort of entrapment." *Id.* at 438; *see also Cox v. Louisiana*, 379 U.S. 559, 571 (1965). And in *Santobello v. New York*, 404 U.S. 257, 261-62 (1971), the Court held that the state must honor promises it makes during plea negotiations. The Court explained that "when a plea rests in any significant degree on a promise or

agreement of the prosecutor, so that it can be said to be part of the induce-
ment or consideration, such promise must be fulfilled." *Id.* at 262.

    **b.**    A state may also violate due process where the government's
conduct plays a role in corrupting the reliability of the truth-finding process.
One familiar example is knowingly using false evidence or testimony to ob-
tain a conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *accord United States
v. Dvorin*, 817 F.3d 438, 452 (5th Cir. 2016). Using false testimony violates due
process "even when the defense is aware of [it]" if "the government rein-
forces the falsehood by capitalizing on it in its closing argument, or the
defense is unable to utilize the information, or when the government there-
after asks misleading questions." *United States v. O'Keefe*, 128 F.3d 885, 894-
95 (5th Cir. 1997) (citations omitted).

    But the state may violate due process even when law enforcement
doesn't knowingly set out to produce unreliable evidence. For example,
when police obtain an eyewitness identification by using a photo array, line-
up, show-up, or "other similar identification procedure[]" that is "'unneces-
sarily suggestive and conducive to irreparable mistaken identification,'"
admitting the identification at trial violates due process. *Reyes v. Nurse*, 38
F.4th 636, 644 (7th Cir. 2022) (quoting *Stovall v. Denno*, 388 U.S. 293, 302

(1967)). The due process problem arises from the combination of "law enforcement use of improper" procedures—improper because they are "unnecessarily suggestive," *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012), like repeatedly showing the eyewitness photos of a particular suspect—and reliability concerns with the identification, *see, e.g.*, *Reyes*, 38 F.4th at 645-46; *Perry*, 565 U.S. at 239-40.

> ### B.   Article 64, as construed by the Texas Court of Criminal Appeals, violates the due-process guarantee.

The non-contamination, exoneration, and unreasonable-delay requirements in Article 64, as authoritatively construed by the CCA, all violate due process, both individually and collectively. *First*, the non-contamination requirement is fundamentally unfair because it makes the state's promise of postconviction relief through DNA testing illusory based on the state's own handling of crime-scene evidence. More generally, it allows the state to rely on DNA evidence no matter the reliability concerns, but bars prisoners from relying on DNA evidence, no matter its reliability or the resulting unreliability to the truth-finding process of excluding it, based on the state's own insufficient procedures. *Second*, the exoneration inquiry violates due process because it prevents prisoners who can demonstrate their innocence with a

combination of posttrial developments and DNA results inculpating a third party from ever obtaining that DNA testing in the first place. *Third*, the unreasonable-delay requirement arbitrarily punishes prisoners for their efforts to develop evidence of innocence and invoking the state's own procedures for proving innocence, and renders Article 64 illusory by requiring prisoners to have predicted that touch-DNA testing was available before the statute said it was. *Finally*, taken together, these three requirements leave even diligent prisoners with strong evidence of innocence little hope of obtaining DNA testing. As construed by the CCA, Article 64 is fundamentally inadequate to vindicate a prisoner's liberty interest in proving his innocence, and thus fails to provide the due process that the Fourteenth Amendment demands.

### 1.    The extratextual non-contamination requirement violates due process.

The non-contamination requirement is fundamentally unfair and violates due process because it (a) breaks promises Texas postconviction law makes to prisoners seeking to prove their innocence; (b) ignores reliability concerns produced by the prosecution; and (c) arbitrarily applies a different standard to inmates and prosecutors.

a.     Texas law promises prisoners that they can prove their innocence based on newly discovered evidence, *see* Tex. Code Crim. Proc. art. 11.071(5)(a)(1), and obtain DNA testing under Article 64 if, among other things, the evidence they seek to test has a sufficient chain of custody, *id.* art. 64.03(a)(1)(A)(ii). But the non-contamination requirement reneges on those promises based on the state's own handling and storage of evidence. It thus makes Article 64 "fundamentally inadequate to vindicate" the defendant's state-created liberty interest in proving his innocence. *Osborne*, 557 U.S. at 69. The state—not the defendant—is responsible for preserving crime-scene evidence, and for a capital defendant that obligation persists until the defendant dies or is released on parole. Tex. Code Crim. Proc. art. 38.43(b), (c)(2)(A). Thus, alleged contamination is the *state's* responsibility, and holding it against the prisoner is fundamentally unfair.

That's especially true because DNA testing can yield highly probative information even where crime-scene evidence was supposedly contaminated because it was handled before adoption of storage and handling protocols. *See* Br. of Chase Baumgartner, *Reed*, No. 21-442 (U.S.). Indeed, the Texas Department of Public Safety has rigorous protocols for detecting, accounting for, and reporting results despite contamination. *Id.* at 9, 13-14. To

account for potential known contaminators, laboratories can collect cheek swabs and compare their DNA profiles with DNA profiles developed from the evidence. *Id.* at 14-15. And laboratories can address multiple DNA profiles on the evidence by "deconvolut[ing]" the DNA mixture, a process that accounts for contaminators' DNA profiles. *Id.* at 15-16. The department can also test evidence that has not been properly sealed or has been comingled or handled without gloves. *Id.* at 10-13. In short, an extratextual non-contamination requirement isn't just unnecessary to protect against unreliable DNA results; it also excludes potentially probative and reliable results.

As one court reasoned in finding another aspect of Article 64 unconstitutional, "[d]ue process does not countenance procedural sleight of hand whereby a state extends a right with one hand and then takes it away with another. To do so renders meaningless an express right and transgresses a principle of fundamental fairness." *Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 911 (S.D. Tex. 2021), *appeal pending*, No. 21-70009 (5th Cir.).

**b.**    Relatedly, the non-contamination requirement is fundamentally unfair because it "place[s] upon the defendant the burden of proving [the evidence's] history while it is held in government custody." *United States v. Fasano*, 577 F.3d 572, 577 (5th Cir. 2009). "[I]n operation," *Osborne*, 557 U.S.

at 69 (quoting *Medina*, 505 U.S. at 446), the CCA's authoritative construction of Article 64 holds supposed contamination against the prisoner even though the state is responsible for the condition of the evidence and even though withholding testing, rather than performing it, is more likely to produce reliability concerns. As just discussed, DNA testing can produce highly probative and reliable results even when it is supposedly contaminated. The result, which the Supreme Court has condemned in the eyewitness-identification context, for example, is to allow law enforcement procedures to cause grave reliability concerns at the defendant's expense. *Supra* pp. 18-19. "A primary aim" of that due process rule "is to deter law enforcement use of improper [procedures] in the first place." *Perry*, 565 U.S. at 241. But the non-contamination requirement ignores that concern. It would allow Texas to prevent any prisoner from ever obtaining postconviction DNA testing simply by improperly handling the evidence. Br. of Eight Retired Judges 23, *Reed*, No. 21-442 (U.S.).

**c.**    Still more, the non-contamination requirement unfairly imposes a more stringent chain-of-custody burden on inmates seeking DNA testing than on prosecutors seeking to introduce evidence at trial. A prosecutor need only "produce evidence sufficient to support a finding that the item is what

[he] claims it is." Tex. R. Evid. 901(a); *see Dossett v. State*, 216 S.W.3d 7, 20-22 (Tex. App. 2006) (possibility of contamination was insufficient to exclude evidence on chain-of-custody grounds). That's why this Court refused to interpret the federal DNA-testing statute, 18 U.S.C. § 3600(a)(4), to contain a non-contamination requirement. *See Fasano*, 577 F.3d at 576. *Fasano* reasoned that the chain-of-custody question is "whether testing offers a reasonable possibility of securing sound DNA results from material for which the usual trial demands for chain of custody can be met." *Id.* And the answer is often yes even where there may have been contamination. *Supra* pp. 21-22. The CCA's construction of Article 64 to include a non-contamination requirement, in contrast, lets the state selectively use DNA evidence against defendants despite the reliability—and thus fundamental-fairness—concerns with doing so.

### 2. The CCA's construction of Article 64's exoneration requirement is unconstitutional.

The CCA's construction of the exoneration inquiry also is fundamentally unfair. According to the CCA, the exoneration inquiry must both ignore posttrial developments discrediting trial evidence, and limit exculpatory DNA-testing results to those "excluding the convicted person as the donor

- 24 -

of th[e] material," even if the results could inculpate someone else but not exclude the convicted person. ROA.296 (citation omitted). Thus, the CCA's construction of the exoneration inquiry prevents an inmate from obtaining DNA testing that, together with posttrial developments, can show his innocence by inculpating a third party. The rule's operation is thus fundamentally unfair. There is no basis in reason to disregard evidence inculpating someone else or discrediting trial evidence, or to ignore the holistic evidentiary picture.

a.    DNA results that fail to exclude another suspect—like Fennell here—are exculpatory. Indeed, the Supreme Court has recognized that the opportunity to present evidence tending to inculpate a third party can be a "critical" part of the "fundamental" right "of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). That's why "widely accepted" "rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime" allow that evidence in unless it "'lack[s] [a] connection with the crime.'" *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) (quoting 41 C.J.S. Homicide § 216, at 56-58 (1991)); *accord Floyd v. Vannoy*, 894 F.3d 143, 163 (5th

Cir. 2018) (evidence supporting third-party-guilt defense is "favorable" to the accused under *Brady*).

Ignoring these principles in the DNA-testing context is fundamentally unfair. "[T]here is no technology comparable to DNA testing," *Osborne*, 557 U.S. at 62, which time and again has "prove[n] factual innocence," *Harvey v. Horan*, 285 F.3d 298, 306 (4th Cir. 2002) (Luttig, J., respecting the denial of rehearing en banc), producing at least 375 exonerations in the United States alone, Br. of Texas Exonerees 4, *Reed*, No. 21-442 (U.S.). And DNA testing is of particular "importance where the right is asserted by one who … has been sentenced to death." *Harvey*, 285 F.3d at 304 (Luttig, J., respecting the denial of rehearing en banc).

The CCA's construction of the exoneration inquiry excludes consideration not just of exculpatory DNA evidence, but also of posttrial factual developments undermining or discrediting trial evidence. The result is that recanted, scientifically disproven testimony, for example, can foreclose DNA testing. But that makes no more sense than allowing states to rely on false evidence—something due process prohibits. *Supra* p. 18.

**b.**     Reed's case demonstrates just how unfair the CCA's authoritative construction of the exoneration inquiry can be. Postconviction

developments show that much of the state's trial evidence is false. For example, the state's pathologist recanted his testimony about Stites' time of death and the likelihood of sexual assault, ROA.73-76, and the agencies that employed the state's experts who testified that spermatozoa cannot survive for more than 24-26 hours issued letters limiting and discrediting that testimony, ROA.83, 85-86. Other evidence undermines the state's theory, too. Fennell confessed to murdering his fiancée for cheating on him with a Black man, and witnesses testified that Reed and Stites were intimately involved and that Stites and Fennell had a tumultuous, violent relationship. *Supra* pp. 5-7. DNA testing could prove Reed's innocence, but the CCA's construction of the exoneration inquiry prevents him from getting it.

### 3. The CCA's construction of Article 64's unreasonable-delay requirement violates due process.

The CCA's construction of Article 64's requirement that the testing request not be for the purpose of unreasonable delay also violates due process. For one thing, the unreasonable-delay requirement arbitrarily punishes prisoners for developing evidence of innocence. For another, it renders Article 64 an illusory promise by preventing any prisoner seeking touch-DNA testing after the 2011 amendments from obtaining testing—even though those

amendments were the first notice that touch-DNA testing was available. *See generally* Br. of Chase Baumgartner, *Reed*, No. 21-442 (U.S.) (describing touch-DNA testing).

    **a.**    The unreasonable-delay requirement permits a finding that a prisoner requested DNA testing for an improper purpose just because he previously litigated his innocence based on other evidence. *E.g.*, *Reed v. State*, 541 S.W.3d 759, 763-64, 777-79 (Tex. Crim. App. 2017). But it is arbitrary and fundamentally unfair for the state to punish a prisoner for exercising his legal rights. By analogy, the government cannot penalize defendants for invoking their *Miranda* right to silence, *Doyle*, 426 U.S. at 618, or use their silence against them at trial, *Griffin v. California*, 380 U.S. 609, 612-15 (1965). Punishing a prisoner for exercising his rights means breaking a promise, and that violates due process. *Supra* pp. 17-18. In essence, the state tells prisoners it can use state-provided procedures to prove their innocence, but then uses the prisoner's invocation of those procedures to shut down access to DNA testing and the promise of some of the most powerful evidence available to prove innocence.

    The unreasonable-delay requirement is particularly perverse where the reason for the supposed delay is the prisoner's development of evidence

of innocence—as here. The requirement doesn't just punish the exercise of the prisoner's rights. It also threatens to nullify Article 64 by using the time required to develop mounting evidence of innocence—which should help satisfy Article 64's exoneration inquiry, *but see supra* pp. 26-27—to shut down the right to prove innocence in the first place. That makes little sense—and, indeed, it punishes prisoners for using postconviction procedures exactly as they are intended.

**b.**    The unreasonable-delay requirement also imposes an unconstitutionally unfair hindsight requirement by allowing later amendments to Article 64 to support a finding that a prisoner should have known earlier that touch-DNA testing was available. That interpretation renders Article 64 an illusory promise.

To explain: The CCA construed the unreasonable-delay requirement to hold against prisoners any pre-2011 delay in seeking touch-DNA testing even though it wasn't clear that Article 64 allowed touch-DNA testing until the law was amended in 2011. Those amendments included in the definition of "biological material" "skin tissue or cells, fingernail scrapings," as well as "other identifiable biological evidence that may be suitable for forensic DNA testing," thus capturing types of biological material suitable for touch-DNA

testing. Tex. Code Crim. Proc. art. 64.01(a)(1) (2011). But, in the CCA's view, touch-DNA testing was available *before* the 2011 amendments, even though Article 64 included no provision purporting to allow it and no decision had granted touch-DNA testing under Article 64. ROA.306-07.

That construction of Article 64 punishes prisoners for not being for-tunetellers. Neither the text of Article 64 nor opinions from the CCA suggested that touch-DNA testing was available before the 2011 amend-ments. Taking away a promise made to prisoners because they couldn't guess what words a court might later read into a statute is fundamentally unfair. *Supra* pp. 17-18. As the Supreme Court has explained, a "fundamen-tal principle in our legal system," backed by the due-process guarantee, "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required"; laws that are "impermissibly vague" are in-valid. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

### 4. Individually and collectively, the requirements of Article 64 violate due process.

The chain of custody, exoneration, and unreasonable-delay require-ments each violate due process. But their combined effect, "in operation," *Osborne*, 557 U.S. at 69 (quoting *Medina*, 505 U.S. at 446), exacerbates the

violation because it ensures that Article 64 is fundamentally inadequate to vindicate the prisoner's state-created right to prove his innocence. For prisoners like Reed, Article 64 exists only in theory. The state can block access to DNA testing through its handling of the evidence, continuing to rely on discredited evidence, holding the prisoner's non-DNA-related efforts to prove his innocence against him, and retroactively interpreting Article 64 to require earlier DNA-testing requests. The result is that prisoners like Reed don't receive a fair process for accessing DNA testing to exercise their state-created right to prove their innocence with new evidence. *Supra* pp. 13-14. And by denying prisoners due process, Article 64 enables "the execution of a[n] … innocent person"—"a constitutionally intolerable event." *Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J., concurring).

### C.   The district court's reasoning and Goertz's arguments lack merit.

The district court conclusorily asserted that "[t]here is nothing so egregious in Chapter 64 that rises to the level of a procedural due-process violation." ROA.869. That conclusion, as explained, is wrong. Not one, but *three* requirements in Article 64 violate due process, independently and together. *Supra* pp. 19-31. Goertz's counterarguments don't show otherwise.

**1.** Goertz first argues (Br. 13, 16-17, 31) that the CCA's judicial process was fair. But as the Supreme Court made clear, "Reed does 'not challenge the adverse' state-court decisions themselves, but rather 'targets as unconstitutional the Texas statute they authoritatively construed.'" *Reed*, 143 S. Ct. at 961 (quoting *Skinner*, 562 U.S. at 532).

**2.** Goertz argues (Br. 23-24) that Article 64 can't be unconstitutional because the Constitution doesn't require states to provide postconviction procedures at all. That's wrong, because it's the state's creation of a liberty interest in proving one's innocence through postconviction proceedings that triggers the due-process guarantee, as *Osborne* made clear. *Supra* pp. 13-14.

**3.** Goertz's defenses of the non-contamination requirement fail.

*First*, Goertz insists that the federal statute and other jurisdictions have "chain-of-custody requirement[s]." Br. 17-18. So what? Reed challenges the extratextual non-contamination requirement, which isn't a feature of the federal statute, *see Fasano*, 577 F.3d at 576, or, so far as the caselaw discloses, the other state statutes Goertz cites. *See* Goertz Br. 17 (citing Cal. Penal Code § 1405(g)(2); Fla. Stat. § 925.11(f)(2); 42 Pa. Cons. Stat. § 9543.1(d)(1)(ii)).

*Second*, Goertz argues that admitting evidence at trial is different from obtaining DNA testing and therefore warrants a lesser burden. In Goertz's

view (Br. 18-19), at trial, the court needs to know only that the evidence is what it purports to be, whereas in the DNA-testing context, the court needs to know that testing will produce reliable results before it is even tested. But Goertz gives no reason the standards *should be* different. And such a distinction is arbitrary. Contaminated evidence can provide reliable DNA results — indeed, Texas has rigorous protocols for detecting, accounting for, and reporting reliable results despite contamination. *Supra* pp. 21-22. And if DNA testing *cannot* produce reliable evidence, then why can *prosecutors* rely on it?

Changing tacks, Goertz asserts (Br. 19-20) that tampering and comingling are relevant to admissibility at trial. But Reed challenges a non-contamination requirement, not a non-tampering or non-comingling requirement. Although tampering and comingling may cause contamination, contamination sweeps far more broadly.

*Third*, Goertz insists (Br. 20) that the non-contamination requirement doesn't make Article 64 an illusory promise because the CCA found that Reed couldn't access DNA testing for other reasons, too. But again, "Reed does 'not challenge the adverse' state-court decisions themselves, but rather 'targets as unconstitutional the Texas statute they authoritatively construed.'" *Reed*, 143 S. Ct. at 961 (quoting *Skinner*, 562 U.S. at 532). And the

Supreme Court made clear that Reed's claims are redressable "if a federal court concludes that Texas's post-conviction DNA testing procedures violate due process." *Reed*, 143 S. Ct. at 960.

*Finally*, Goertz insists that the unpublished decision in *Pruett v. Choate*, 711 F. App'x 203, 206-07 (5th Cir. 2017), forecloses Reed's claim. Opp. 4-5 (ECF No. 82). But *Pruett* didn't address the non-contamination requirement Reed challenges. Instead, *Pruett* rejected the argument that the factual finding of contamination in Pruett's case was unsupported and barred by res judicata. Opening Br. 15-17, 22-23, 25-26, *Pruett*, No. 17-70021 (5th Cir.); *see Pruett v. State*, No. AP-77,065, 2017 WL 1245431, at *11-12 (Tex. Crim. App. April 5, 2017).

> **4.**    Goertz's defenses of the exoneration inquiry likewise lack merit.

*First*, Goertz insists that "Texas is not alone in limiting the evidence to be considered" in the exoneration analysis. Br. 24-25. But none of the examples Goertz gives addresses Reed's challenge. Instead, Goertz makes a winding argument (Br. 25) that the Supreme Court must have endorsed an evidence-at-the-time-of-trial restriction in *Osborne* because it reversed the Ninth Circuit's decision, which looked more broadly than the evidence at trial. But the Supreme Court never addressed this issue, instead holding that

Osborne, who (unlike Reed) never tried the state's procedures, could not show that those procedures were fundamentally inadequate to vindicate his liberty interest in proving his innocence. *Osborne*, 557 U.S. at 69-70.

The state-court decisions Goertz cites don't address Reed's challenge to the CCA's authoritative construction of the exoneration inquiry, either. *Meinhard v. State*, 371 P.3d 37, 44 (Utah 2016), concluded that courts analyze the effect of the DNA results themselves, not "any and all evidence that might conceivably be uncovered as an indirect result of DNA tests." And like *Osborne*, *Anderson v. State*, 831 A.2d 858, 867 (Del. 2003), simply explained that "[w]hen deciding whether evidence is materially relevant, the trial court must consider not only the exculpatory potential of a favorable DNA test result, but also the other evidence presented at trial." It didn't foreclose consideration of DNA test results inculpating third parties or other postconviction evidence.

*Second*, Goertz claims that due process does not require as extensive an analysis as a "retrial" or "a claim of actual innocence," because, as in other "constitutional contexts," the focus is on what happened at trial. Br. 22-23, 25, 33. But those contexts involve claims that something about the trial process *itself* was unconstitutional, so it makes sense to focus on the evidence at

trial. Indeed, it makes sense that the inquiry into whether counsel's performance was reasonable in ineffective-assistance-of-counsel cases focuses on the "the time of counsel's conduct." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). But even in the ineffective-assistance-of-counsel context, evaluating prejudice *does* often require consideration beyond the trial context, of what *would* have happened had counsel performed reasonably and performed an investigation that could have developed additional evidence supporting the defense. *See, e.g.*, *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (per curiam); *Cook v. Foster*, 948 F.3d 896, 909 (7th Cir. 2020).

In the postconviction context, it's even clearer that limiting the inquiry to the time of trial may be constitutionally problematic. State law gives prisoners the right to prove their innocence *with newly discovered evidence*, including DNA testing. *Supra* pp. 13-14. Restricting the inquiry to trial evidence simply claws back with one hand what the state gave with another, leaving the DNA-testing procedures inadequate to protect the liberty interest in proving one's innocence by newly discovered evidence.

And the problem goes beyond the freeze-frame at the time of trial. The combination of requiring consideration of discredited trial evidence—which raises additional due-process concerns about reliance on false evidence—

and prohibiting consideration of DNA results inculpating a third party ensures that the exoneration requirement is fundamentally unfair. *Supra* pp. 24-27. That's especially true given that many posttrial factual developments result from uncovering constitutional problems, like *Brady* violations. Limiting the exoneration inquiry to the evidence at the time of trial, despite the constitutional problems that later-developed evidence may reveal, undermines those other constitutional guarantees and results in procedures fundamentally inadequate to vindicate the right state law confers to prove one's innocence with newly discovered evidence. *Supr*a pp. 26-27. Again, take the *Strickland* ineffective-assistance-of-counsel context to which Goertz wants to analogize: "[r]ather than ask how prejudicial each individual error was, [courts] evaluate [counsel's] performance as a whole"—that is, courts "consider the cumulative effect of counsel's errors." *Cook*, 948 F.3d at 908.

*Third*, Goertz asserts that the unpublished decision in *Garcia v. Castillo*, 431 F. App'x 350, 353 (5th Cir. 2011) (per curiam), issued well before the CCA's authoritative construction of the exoneration requirement in Reed's case, shows that Article 64's exoneration requirement is constitutional. Opp. 4-5 (ECF No. 82). But the panel in *Garcia* didn't address the claim Reed presses here. Instead, it merely held that "[u]ncontested evidence in the

record" supported the district court's decision not to permit DNA testing. 431 F. App'x at 354. *Garcia* doesn't support Goertz's defense of the problems Reed has identified with the CCA's authoritative construction of Article 64's exoneration inquiry.

*Finally*, Goertz contends (Br. 25-26) that accepting Reed's arguments would create a substantive due process right to DNA testing in all cases and amount to an "unprecedented expansion of constitutional law," Br. 32-33. That was never a serious argument, and it certainly doesn't survive the Supreme Court's observation that Reed "assert[s] that Texas's post-conviction DNA testing law *failed to provide procedural due process*." *Reed*, 143 S. Ct. at 960 (emphasis added). Reed's point is that Article 64's procedures, including its too-narrow exoneration inquiry, violate due process, not that there can be no procedures and that prisoners have a substantive due process right to DNA testing. Holding that Article 64's procedures violate due process would not eliminate Article 64 and create an automatic right to DNA testing; as to the exoneration requirement, it would simply require consideration of postconviction evidence and DNA testing results inculpating third parties.

**5.**    Goertz's only defense of the CCA's construction of the unreasonable-delay requirement is that it is "similar" to the "diligent[] pursu[it]"

requirement the Supreme Court found constitutional in *Osborne*, 557 U.S. at 70, as well as the federal statute and nameless "law[s] of other states." Br. 30. But, again, Reed doesn't challenge a generic diligent-pursuit requirement. Instead, he challenges the CCA's fundamentally unfair construction of that requirement that penalizes prisoners for using the state's own procedures to develop evidence of innocence. *Supra* pp. 27-29. *Osborne* doesn't address those arguments. And Goertz's general insistence that there are "other" "similar" laws don't do him any favors, either, since Goertz hasn't pointed to a case addressing a challenge like Reed's.

## CONCLUSION

This Court should reverse and remand.


Dated: July 3, 2023                    Respectfully submitted,

                                       /s/ Parker Rider-Longmaid


Cliff Gardner                          Parker Rider-Longmaid
Michelle L. Davis                        Counsel of Record
Nicole A. DiSalvo                      Hanaa Khan
Gregory P. Ranzini                     SKADDEN, ARPS, SLATE,
Peyton V. Carper                         MEAGHER & FLOM LLP
SKADDEN, ARPS, SLATE,                  1440 New York Ave., NW
  MEAGHER & FLOM LLP                   Washington, DC 20005
920 N. King St.                        Telephone: 202-371-7000
Wilmington, DE 19801                   parker.rider-longmaid@skadden.com

Barry C. Scheck                        Andrew F. MacRae
Jane Pucher                            MACRAE LAW FIRM PLLC
THE INNOCENCE PROJECT                  3267 Bee Cave Rd., Ste. 107, PMB 276
40 Worth St., Ste. 701                 Austin, TX 7846
New York, NY 10013


*Counsel for Plaintiff-Appellant Rodney Reed*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this supplemental brief complies with the type-volume limitation set out in the Court's May 23, 2023, order because, as calculated by Microsoft Word, it contains 7,987 words, within the order's limit of 8,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I also certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: July 3, 2023                    */s/ Parker Rider-Longmaid*
                                       Parker Rider-Longmaid

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2023, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: July 3, 2023                    */s/ Parker Rider-Longmaid*
                                       Parker Rider-Longmaid