No. 19-70022

In the
# United States Court of Appeals
### for the Fifth Circuit

RODNEY REED,

*Plaintiff-Appellant,*

v.

BRYAN GOERTZ,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Western District of Texas, No. 1:19-cv-794,
Hon. Lee Yeakel, *United States District Judge*

## PLAINTIFF-APPELLANT RODNEY REED'S
## PETITION FOR PANEL REHEARING

Cliff C. Gardner
Michelle L. Davis
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King St.
Wilmington, DE 19801

Barry C. Scheck
Jane Pucher
THE INNOCENCE PROJECT
40 Worth St., Ste. 701
New York, NY 10013

Andrew F. MacRae
MACRAE LAW FIRM PLLC
3267 Bee Cave Rd., Ste. 107,
  PMB 276
Austin, TX 78746

Parker Rider-Longmaid
  *Counsel of Record*
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

Jeremy Patashnik
Sarah Leitner
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Plaintiff-Appellant Rodney Reed*

# CERTIFICATE OF INTERESTED PERSONS

*Reed v. Goertz*, No. 19-70022

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## I. Parties

The Plaintiff-Appellant is Rodney Reed, and the Defendant-Appellee is Bryan Goertz. Steve McCraw, Sarah Loucks, and Maurice Cook were Defendants in the district court, but were terminated as parties on October 1, 2019.

## II. Interested parties

### A. Counsel for Plaintiff-Appellant

Counsel for Plaintiff-Appellant in the litigation are:

- Parker Rider-Longmaid, Cliff C. Gardner, Raza Rasheed, Jason Liberi, Michelle L. Davis, Nicole DiSalvo, Jeremy Patashnik, Hanaa Khan, and Sarah Leitner; Skadden, Arps, Slate, Meagher & Flom LLP

- George Kendall and Nicola Cohen; Squire Patton Boggs (US) LLP

- Barry C. Scheck and Jane Pucher; The Innocence Project

- Andrew F. MacRae; MacRae Law Firm, PLLC

- Robert Alan Weber; Chipman Brown Cicero & Cole, LLP

- Quinncy McNeal; Husch Blackwell LLP

**B.    Counsel for Defendant-Appellee**

Counsel for Defendant-Appellee in the litigation are:

- Travis Bragg, Matthew Dennis Ottoway, Gwendolyn Suzanne Vindell, and Ann Hahn; Office of the Attorney General of Texas

**C.    Other interested parties**

To counsel's knowledge, there are no additional firms or persons with an interest in the outcome of the litigation.

Dated: May 15, 2025            */s/ Parker Rider-Longmaid*
                              Parker Rider-Longmaid

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

TABLE OF AUTHORITIES ............................................................................ v

INTRODUCTION ..................................................................................... 1

BACKGROUND ....................................................................................... 4

    A.    Factual background .......................................................... 4

    B.    Procedural background ..................................................... 5

ARGUMENT ........................................................................................... 8

I.    The panel overlooked Reed's argument that Article 64's non-contamination requirement violates due process because it denies access to reliable DNA-testing results based on the false but irrebuttable presumption that testing contaminated evidence cannot yield reliable results ......................................................... 8

    A.    The non-contamination requirement is fundamentally unfair because it arbitrarily bars prisoners from obtaining exculpatory results, as this case shows. ......................................... 9

            1.    The CCA's non-contamination requirement is arbitrary because purported contamination does not prevent DNA testing from yielding reliable exculpatory results. .................................................... 9

            2.    Article 64's non-contamination requirement arbitrarily and unconstitutionally prevents Reed from obtaining DNA testing. ................................. 13

    B.    This Court and the Nebraska Supreme Court have explained why non-contamination requirements do not make sense. ...................................................... 14

**TABLE OF CONTENTS**
(continued)

II.  Holding Article 64's non-contamination requirement unconstitutional would redress Reed's injury, even if no other provision of Article 64 violates due process, because it would leave Goertz unable to rely on Article 64's other requirements. .........16

   A.  If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the exoneration requirement to deny testing of the murder weapon...................18

   B.  If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the unreasonable-delay requirement to deny testing of the murder weapon. .......19

CONCLUSION .....................................................................................21

CERTIFICATE OF COMPLIANCE ...................................................22

CERTIFICATE OF SERVICE .............................................................23

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*District Attorney's Office for the Third Judicial District v. Osborne,*
557 U.S. 52 (2009) ............................................................................ 11, 12, 13

*Dossett v. State,*
216 S.W.3d 7 (Tex. App. 2006) ........................................................... 10

*Ex parte Reed,*
271 S.W.3d 698 (Tex. Crim. App. 2008) ....................................... 4, 13, 14, 18

*Holmes v. South Carolina,*
547 U.S. 319 (2006) ............................................................................ 9, 12

*Kelson v. Clark,*
1 F.4th 411 (5th Cir. 2021) ............................................................... 17, 20

*Medina v. California,*
505 U.S. 437 (1992) ............................................................................ 13

*Reed v. Goertz,*
598 U.S. 230 (2023) ......................................................................... 3, 6, 17

*Reed v. Goertz,*
995 F.3d 425 (5th Cir. 2021) ............................................................... 6

*Reed v. Texas,*
140 S. Ct. 686 (2020) ......................................................................... 5

*State v. Pratt,*
842 N.W.2d 800 (Neb. 2014) ............................................................. 15, 16

*United States v. Fasano,*
577 F.3d 572 (5th Cir. 2009) ............................................................. 15, 16

*Wolff v. McDonnell,*
418 U.S. 539 (1974) ............................................................................ 9

Statutes and Rule

42 U.S.C. § 1983 ............................................................................... 5

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Tex. Code Crim. Proc. art. 64..................................................................... 1, 2, 3,
.................................................................................. 5, 6, 7, 8,11,
.................................................................................. 12, 13, 16, 17,18, 19

Tex. R. Evid. 901(a)..............................................................................10

## INTRODUCTION

Rodney Reed respectfully submits that two errors in the Court's opinion justify panel rehearing. The opinion holds that it is not fundamentally unfair for District Attorney Bryan Goertz to deny Reed DNA testing that could exonerate him by showing a high concentration of someone else's DNA—like Jimmy Fennell's—all over the murder weapon. But Goertz's and Article 64's reason for that result—that contamination might prevent reliable testing results—is arbitrary, as this Court's and the Nebraska Supreme Court's reasoning elsewhere confirms. By irrebuttably presuming that testing cannot produce reliable results—a scientifically debunked notion that the state itself rejects when prosecuting defendants—Article 64's non-contamination requirement bars the very testing needed to show reliable results and, in turn, to vindicate the prisoner's state-created liberty interest in proving his innocence.

**1.**     The panel overlooked Reed's argument that Article 64's non-contamination requirement is fundamentally unfair because it arbitrarily denies prisoners access to reliable, probative testing results by making the irrebuttable (and often incorrect) assumption that DNA testing cannot yield reliable, probative results. *See* Op. 11-15. DNA testing can account for

contamination, as a Supreme Court amicus brief supporting Reed explained. Testing results can thus still be highly probative even when the sample has been contaminated. The only way to discover whether evidence, contaminated or not, contains probative DNA evidence is to test it, as this Court and other courts have elsewhere recognized. But Article 64's non-contamination requirement denies that DNA-testing science—while state law lets prosecutors embrace that science—and instead makes an assumption that can be rebutted only by the very testing that the requirement arbitrarily prevents.

Applying Article 64's non-contamination requirement to Reed shows why the requirement is fundamentally unfair. Reed seeks testing of the belt used to strangle Stacey Stites. Investigators posited that the killer exerted significant force on that belt for at least three minutes to murder Stites. That means that the perpetrator's DNA would likely be found in high concentrations on the belt, unlike the very low concentrations of DNA from hypothetical contamination. What's more, given the belt's chain of custody, any contamination would likely come from known court personnel, attorneys, or jurors—all of whom testing could account for. DNA testing the belt alone could show that Reed is innocent. Relying on the non-contamination requirement to deny him that testing is unconstitutional.

**2.** The panel also erred in concluding (Op. 10-11 & n.7) that Reed needed to show that *all three* of the Article 64 provisions he challenges—the non-contamination, exoneration, and unreasonable-delay requirements—violate due process. The non-contamination requirement's unconstitutionality alone entitles Reed to relief, because holding only that requirement unconstitutional would likely result in testing the belt.

A federal court can redress the alleged unconstitutional denial of DNA testing if a favorable judgment would result in "'a significant increase in the likelihood' that the state prosecutor would grant access to the requested" testing. *Reed v. Goertz*, 598 U.S. 230, 234 (2023). Here, a judgment declaring Article 64's non-contamination requirement unconstitutional would significantly increase the likelihood of securing testing of the belt. The belt likely contains a high concentration of the killer's DNA, so a high concentration of Jimmy Fennell's (or someone else's DNA) would *satisfy* Article 64's exoneration requirement. The Texas Court of Criminal Appeals (CCA) didn't conclude otherwise—to the contrary, it didn't consider the belt, or any of the other evidence it found contaminated, in its exoneration or unreasonable-delay analysis. Rather, the exoneration analysis looked only to non-contaminated evidence, and the unreasonable-delay determination was motion-

specific and did not address a request to test only the belt—testing Reed has sought since 1999. Thus, Goertz would be unable to rely on any such finding or consideration to deny testing of the belt if the non-contamination requirement were held unconstitutional. At minimum, on a motion to dismiss, the Court cannot assume that those issues would be resolved against Reed on a renewed testing request.

The panel should grant rehearing.

## BACKGROUND

### A.    Factual background

**1.**    Reed has been on death row since 1998 for the murder of Stacey Stites, a crime he steadfastly maintains he did not commit. In 1996, Stites, a 19-year-old white woman, was found dead on the side of a Bastrop County road. *Ex parte Reed*, 271 S.W.3d 698, 702 (Tex. Crim. App. 2008). She had been strangled with her belt. *Id.* at 706.

Fennell, a white police officer engaged to Stites, was the last person known to have seen her alive. *Id.* at 703. But police targeted Reed, a Black man, after finding three sperm matching Reed's DNA inside Stites' vaginal tract. *Id.* at 705, 710. Reed protested his innocence, explaining that he and

Stites were having an affair. An all-white jury convicted Reed, who then received a death sentence.

2.	Over the last two decades, Reed has developed a "considerable body of evidence" that he is innocent. *Reed v. Texas*, 140 S. Ct. 686, 687 (2020) (statement of Sotomayor, J., respecting the denial of certiorari). For example, after Fennell was incarcerated for sexually assaulting a woman in his police custody, ROA.169-70, another inmate came forward to say that Fennell confessed to murdering Stites because she was cheating on him with a Black man, ROA.620-22.

## B.	Procedural background

1.	Reed first sought and was denied DNA testing—including of the belt used to strangle Stites—in 1999. ROA.172. In 2014, Reed filed another motion in Texas court, under Article 64, seeking to test the belt and other key evidence. ROA.277-78. The trial court denied Reed's motion, ROA.206-222, and the CCA affirmed, ROA.271.

2.	a.	Reed sued in federal court under 42 U.S.C. § 1983, challenging Article 64 as authoritatively construed by the CCA. ROA.857. Reed's amended complaint sets out three ways Article 64 violates due process. Reed Suppl. Br. 8-10 (ECF No. 103). *First*, Article 64's extratextual non-

contamination requirement is unconstitutional because, among other reasons, it arbitrarily forecloses "relief to any person convicted before rules governing the State's handling and storage of evidence were put in place." ROA.177-78, 183-84. *Second*, Article 64's exoneration requirement is unconstitutional because it permits consideration of discredited trial evidence while prohibiting consideration of DNA-testing results inculpating a third party. ROA.186-88. *Finally*, Article 64's unreasonable-delay requirement is unconstitutional because it punishes prisoners who have diligently sought to develop evidence of their innocence and who could not have known before Article 64's amendment that the statute made touch-DNA testing available. ROA.178-79.

**b.** The district court dismissed Reed's suit for failure to state a claim, ROA.869, and this Court affirmed because it found Reed's suit untimely, *Reed v. Goertz*, 995 F.3d 425, 430-31 (5th Cir. 2021). The Supreme Court reversed. *Reed*, 598 U.S. at 232.

**3.** On remand, this Court affirmed the dismissal of Reed's lawsuit on the merits. The panel held that Reed must show that "all three" provisions of Article 64 that he challenges "are fundamentally inadequate" to vindicate his "right to postconviction DNA testing." Op. 10-11. The panel reasoned

that Article 64 allows "testing 'only if' all of its requirements are met." Op. 11 n.7. Thus, the panel continued, "so long as Reed fails to satisfy at least one requirement that passes constitutional muster," Goertz or a state court "would remain statutorily required to deny testing." *Id.*

The panel concluded that Article 64's non-contamination, exoneration, and unreasonable-delay requirements do not violate due process. Op. 10-11. *First*, the panel held that, absent a showing of bad faith on the state's part, it is not fundamentally unfair to impose a non-contamination requirement even when the state's mishandling potentially contaminated the evidence. Op. 12. *Second*, the panel held that a result that fails to exclude Fennell would not necessarily be exculpatory, so Reed cannot show that the exoneration requirement is unconstitutional as applied here. Op. 15-17. *Finally*, the panel reasoned that the CCA's application of the unreasonable-delay requirement "hardly seems arbitrary" and thus was not fundamentally unfair. Op. 17-19.

# ARGUMENT

**I.  The panel overlooked Reed's argument that Article 64's non-contamination requirement violates due process because it denies access to reliable DNA-testing results based on the false but irrebuttable presumption that testing contaminated evidence cannot yield reliable results.**

Rehearing is warranted because the panel overlooked Reed's argument that Article 64's non-contamination requirement is arbitrary and fundamentally unfair given that there can be "probative results even where there is contamination." Oral Arg. 9:24-9:35; Reed Suppl. Br. 30-31; Reed Suppl. Reply 6-7 (ECF No. 119). Addressing Reed's other arguments, the panel held that the non-contamination requirement is constitutional because it is not fundamentally unfair to hold the state's mishandling of evidence (absent a showing of bad faith) against a prisoner and because a state can constitutionally impose a more-stringent standard for postconviction DNA testing than applies at trial. *See* Op. 12-15. Those conclusions (which Reed respectfully disagrees with) don't address Reed's argument that the non-contamination requirement arbitrarily excludes reliable, probative results based on an incorrect assumption that only the blocked testing can disprove.

**A.** **The non-contamination requirement is fundamentally unfair because it arbitrarily bars prisoners from obtaining exculpatory results, as this case shows.**

    **1.** **The CCA's non-contamination requirement is arbitrary because purported contamination does not prevent DNA testing from yielding reliable exculpatory results.**

**a.** "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Due process "entitle[s] [prisoners] to those minimum procedures appropriate under the circumstances … to insure that [a] state-created right is not arbitrarily abrogated." *Id.* at 557. The due-process guarantee is thus "abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary or disproportionate to the purposes they are designed to serve.'" *Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006). Put differently, *Wolff* and *Holmes* make clear that arbitrary rules of evidence violate due process.

**b.** Denying DNA testing based on purported contamination of evidence is illogical, arbitrary, and disproportionate to whatever purposes the non-contamination requirement is designed to serve.

The non-contamination requirement rests on the assumption that contaminated evidence cannot yield reliable DNA-testing results. But that

assumption is wrong. DNA testing a contaminated sample can still yield highly probative information. *See* Br. of Chase Baumgartner 6, *Reed*, 598 U.S. 230 (No. 21-442). Indeed, the Texas Department of Public Safety has rigorous protocols for detecting, accounting for, and reporting results despite contamination. *Id.* at 9, 13-14. For example, tests can reveal the concentration of DNA from a given profile, helping analysts discern whether that DNA was likely deposited through contamination. And to account for potential known contaminators, laboratories can collect cheek swabs and compare their DNA profiles with DNA profiles developed from the evidence. *Id.* at 14-15. In addition, laboratories can address multiple DNA profiles on the evidence by "deconvolut[ing]" the DNA mixture, a process that accounts for contaminators' DNA profiles. *Id.* at 15-16. Laboratories regularly use these technologies to test evidence that has not been properly sealed or has been comingled or handled without gloves. *Id.* at 10-13.

Elsewhere, Texas shows that it understands this science and *agrees* with it. If the chain-of-custody requirement is satisfied (as it is for the belt Reed seeks to test), prosecutors can introduce contaminated DNA evidence at trial—when a defendant's constitutional rights are at their zenith. *See* Tex. R. Evid. 901(a); *Dossett v. State*, 216 S.W.3d 7, 20-22 (Tex. App. 2006). If

contaminated evidence can yield probative DNA-testing results at trial (it can), it can do the same after trial. The point is not that the standards governing evidence at trial must be the same as those governing postconviction proceedings. *Cf.* Op. 14. The point is that it's irrational, arbitrary, and fundamentally unfair to simultaneously adopt DNA science and the reality that testing contaminated evidence *can* produce reliable DNA results, on the one hand, and deny that same science and conclusively presume that testing contaminated evidence *cannot* produce reliable results. Both cannot be true — and Texas *relies on* DNA testing's ability to produce reliable results from contaminated evidence.

The result of the contrary, irrebuttable presumption under Article 64 is that Article 64's procedures "are fundamentally inadequate to vindicate the substantive rights provided" to prove one's innocence through newly discovered evidence. *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 69 (2009). The only way to prove one's innocence through DNA testing is to obtain those testing results. But there is no way to get that testing under Article 64 when the evidence is supposedly contaminated, because the non-contamination requirement bars the very testing

required to prove that the supposed contamination does *not* prevent reliable results.

A non-contamination requirement isn't necessary to protect against unreliable DNA results; the testing itself does that. *See* Baumgartner Br. 17-18. Instead, all a non-contamination requirement does is arbitrarily exclude potentially probative and reliable results, thus undermining reliability of the postconviction procedures' truth-seeking function. By denying prisoners access to probative results based on concerns about contamination that Texas elsewhere relies on DNA analysts to account for, Article 64's non-contamination requirement "infring[es] upon a weighty interest of the accused" and is "arbitrary or disproportionate to the purposes [it is] designed to serve." *Holmes*, 547 U.S. at 324-25. The non-contamination requirement makes Article 64 "fundamentally inadequate to vindicate" the state-created liberty interest that prisoners like Reed have in proving their innocence by depriving them of the very testing they need to show their innocence. *Osborne*, 557 U.S. at 69.

### 2. Article 64's non-contamination requirement arbitrarily and unconstitutionally prevents Reed from obtaining DNA testing.

Reed's case shows precisely how Article 64's non-contamination requirement "transgresses" "recognized principle[s] of fundamental fairness in operation" and thus violates due process. *Id.* (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). The CCA determined that both pieces of the belt used to strangle Stites could not be tested under Article 64 because those "items were handled by ungloved attorneys, court personnel, and possibly the jurors." ROA.286-87. But denying testing for that reason arbitrarily prevents Reed from obtaining potentially exculpatory results. Investigators concluded that "a great force had been applied" to Stites' neck, *Reed*, 271 S.W.3d at 705, and the prosecution told the jury at closing argument that the killer "strangled the life" out of Stites with the belt for "three to four minutes." SA49, SA61, *In re Reed*, No. 24-50529 (5th Cir. Nov. 5, 2024), ECF No. 4; *see* Oral Arg. 12:00-12:35. Thus, it is likely that testing the belt would reveal a high concentration of the killer's DNA in the belt's webbing. If Reed's DNA is not on the belt, but there is a high concentration of Fennell's (or someone else's), that would strongly suggest Reed is innocent.

Potential contamination would not diminish the belt's evidentiary value. As explained, DNA due to contamination is likely to have been deposited in much smaller concentrations than DNA from the killer, who exerted "great force" on the belt for over three minutes. *Reed*, 271 S.W.3d at 705-06. Thus, any DNA deposited by court personnel would not make results unreliable. Indeed, "[e]ven in this worst-case scenario of developing the most complex, contaminated DNA profile that can still be interpreted," Texas Department of Public Safety analysts "could accurately include or exclude [Reed] or Mr. Fennell with above 95% accuracy." Baumgartner Br. 18.

The state might argue that the non-contamination requirement saves money where there is some possibility that testing cannot produce reliable results. But that rationale cannot overcome the rule's arbitrariness, as discussed. It also makes little sense where, as here, the prisoner's lawyers have repeatedly offered to pay for testing.

**B.      This Court and the Nebraska Supreme Court have explained why non-contamination requirements do not make sense.**

In interpreting the federal and Nebraska postconviction DNA-testing statutes, both this Court and the Nebraska Supreme Court have explained why a non-contamination requirement would defeat the purpose of those

statutes. Although those rulings are not due-process holdings, their reasoning shows why a non-contamination requirement is illogical and arbitrary.

In *United States v. Fasano*, 577 F.3d 572, 576 (5th Cir. 2009), this Court refused to read a non-contamination requirement into the federal postconviction DNA-testing statute, explaining that the statute did not "impose a more exacting standard" beyond the "showing of the chain of custody." Indeed, "much of the uncertainty inherent in this predictive exercise can be dispelled only by the tests a petitioner is seeking." *Id.* Stated differently, it's impossible to know whether testing will produce probative results without testing the sample, no matter whether it is contaminated. Indeed, in Reed's case, the belt might not be contaminated at all, but there's no way of knowing without testing.

Likewise, in *State v. Pratt*, 842 N.W.2d 800, 811 (Neb. 2014), the Nebraska Supreme Court refused to read a non-contamination requirement into Nebraska's postconviction DNA-testing statute. *See* Reed Br. 32-33 (ECF No. 28); Oral Arg. 16:58-17:28. Interpreting the statute "as demanding that the biological evidence was secured in a way likely to avoid accidental contamination with extraneous DNA" would "undermine[]" "the express purposes of the [statute]." *Pratt*, 842 N.W.2d at 811. The court reasoned that

a postconviction DNA-testing statute would not be "drafted to prevent dis-covery of relevant exculpatory DNA evidence simply because the evidence was not stored or handled in a manner comporting with current scientific knowledge and standards." *Id.* at 811-12. "Despite any mixtures with extra-neous DNA," the court explained, "a partial or full profile of the perpetrator's DNA could still be obtained" because there was an adequate chain of custody which gave analysts "knowledge of the past storage and handling" of the evidence. *Id.* at 811.

To be sure, *Fasano* and *Pratt* are not constitutional holdings. *See* Op. 14. But they show why non-contamination requirements are arbitrary, because they deny the very science on which DNA-testing regimes rest and make it impossible to get the DNA necessary to pursue the state-created liberty in-terest. And an arbitrary constraint on a state-created liberty interest violates due process. *Supra* pp. 8-9.

## II. Holding Article 64's non-contamination requirement unconstitutional would redress Reed's injury, even if no other provision of Article 64 violates due process, because it would leave Goertz unable to rely on Article 64's other requirements.

Rehearing is also warranted because the panel mistakenly concluded that Reed needed to succeed in challenging "all three" of Article 64's

requirements. *See* Op. 10-11 & n.7. That was error. Those requirements "each violate due process" on their own, Reed Suppl. Br. 30-31, and Reed would not need to win on all three to obtain relief, Oral Arg. 2:35-6:49. Reed can prevail if Article 64's non-contamination requirement—and only that requirement—violates due process.

The panel reasoned that Reed needed to succeed in attacking all three requirements, because "so long as Reed fails to satisfy at least one requirement that passes constitutional muster, [the CCA] would remain statutorily required to deny testing." Op. 10-11 & n.7. The flaw in the Court's reasoning was in failing to recognize that a declaratory judgment that Article 64's non-contamination requirement violates due process "would eliminate the state prosecutor's justification for denying DNA testing." *Reed*, 598 U.S. at 234. It thus would result in "'a significant increase in the likelihood' that the state prosecutor would grant access to the requested" DNA testing, making Reed's injury redressable and giving him standing. *Id.* And in conducting that inquiry at the motion-to-dismiss stage, the Court must "draw all reasonable inferences in favor of the nonmoving party." *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021). Doing so means the Court cannot assume that Reed's

DNA-testing request would be denied based on the exoneration or unrea-

sonable-delay requirements.

**A.    If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the exoneration requirement to deny testing of the murder weapon.**

The panel erred in concluding that Article 64's exoneration require-

ment would justify denying a renewed DNA-testing request.

**1.**    Even accepting the CCA's narrow construction of Article 64 that

"'[e]xculpatory results' means only results excluding the convicted person

as the donor of this material," ROA.296, testing results showing a high con-

centration of another person's DNA on the belt used as a murder weapon,

and particularly in the belt's webbing, would be highly exculpatory. The

killer applied "a great force" to the belt for "three to four minutes" to stran-

gle Stites. *Reed*, 271 S.W.3d at 705-06. Finding a high concentration of

someone else's DNA on the belt (like Fennell's), particularly all over the belt

and in its webbing, but not Reed's, *would* exclude Reed as the killer-donor,

and thus would satisfy Article 64's exoneration requirement. At minimum,

on a motion to dismiss, this Court cannot assume that Goertz or a court

would deny Reed's renewed request to DNA-test the murder weapon based

on Article 64's exoneration requirement.

**2.** Nor could Goertz rely on the CCA's resolution of Reed's 2014 Article 64 motion to deny testing of the belt based on the exoneration requirement. The CCA denied testing of the belt based only on the non-contamination requirement. ROA.286-88; Oral Arg. 2:45-3:17, 6:32-6:48. In its decision, the CCA "pause[d] to summarize what evidence remain[ed] after [its] conclusions" on the non-contamination requirement "[b]efore addressing" the exoneration requirement. ROA.294. The CCA listed condoms, fingerprints found on Fennell's truck, a white paper napkin, an H.E.B. pen, a cigarette lighter, beer cans, a package of gum, and a metal box cutter. ROA.294-95. The CCA then concluded that "Reed cannot establish" that "exculpatory [DNA] results" on those items "would have, by a preponderance of the evidence, resulted in his acquittal." ROA.296-97. In short, the CCA never conducted an exoneration analysis on the belt.

**B. If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the unreasonable-delay requirement to deny testing of the murder weapon.**

The panel also erred in concluding that Article 64's unreasonable-delay requirement would justify denying a renewed request for DNA testing.

The CCA has explained that the "unreasonabl[e] delay" inquiry "consider[s] the circumstances surrounding the request," including "the

promptness of the request, the temporal proximity between the request and the sentence's execution, or the ability to request the testing earlier." ROA.304. The assessment is "inherently fact-specific and subjective." *Id.* In Reed's case, the CCA concluded, based on "the totality of circumstances surrounding Reed's [2014] motion," that Reed was "unable to establish by a preponderance of the evidence that his motion was not made for the purpose of delay." ROA.307. In particular, the CCA noted that that motion "was filed on the same day the judge heard the State's motion to set an execution date" and it included a "request to test a significant number of items, including some items … whose relevance to the crime are unknown." ROA.304-06.

Even putting aside Reed's disagreement with the CCA's characterizations and factbound conclusions on his last DNA-testing motion, the CCA's analysis makes clear that Reed could show he had not unreasonably delayed when renewing his request for DNA testing and focusing only on the murder weapon. The CCA's previous unreasonable-delay analysis would not control on a renewed DNA-testing request, and the Court cannot assume — drawing all reasonable inferences in Reed's favor, *Kelson*, 1 F.4th at 416 — that the request would be denied. *See* Oral Arg. 4:10-4:20. Reed has been requesting DNA testing of the belt since 1999, *supra* p. 5, and the belt is not one of

"a significant number of items, including some items … whose relevance to the crime are unknown." ROA.304. Thus, the unreasonable-delay requirement wouldn't be a reason to deny testing.

## CONCLUSION

The panel should grant rehearing.


Dated: May 15, 2025

Respectfully submitted,

*/s/ Parker Rider-Longmaid*

Cliff Gardner
Michelle L. Davis
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King St.
Wilmington, DE 19801

Barry C. Scheck
Jane Pucher
THE INNOCENCE PROJECT
40 Worth St., Ste. 701
 New York, NY 10013

Andrew F. MacRae
MACRAE LAW FIRM PLLC
3267 Bee Cave Rd., Ste. 107,
  PMB 276
 Austin, TX 7846

Parker Rider-Longmaid
  *Counsel of Record*
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

Jeremy Patashnik
Sarah Leitner
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Plaintiff-Appellant Rodney Reed*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(g) and 40(d)(2), I hereby certify that (1) this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3) and Fifth Circuit Rule 40.1.3, because it contains 3,896 words, as calculated by Microsoft Word, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(f); and (2) this petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: May 15, 2025                    */s/ Parker Rider-Longmaid*
                                        Parker Rider-Longmaid

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2025, I electronically filed the foregoing petition and following opinion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: May 15, 2025                    */s/ Parker Rider-Longmaid*
                                       Parker Rider-Longmaid

**EXHIBIT A:**
**PANEL OPINION**

# United States Court of Appeals
# for the Fifth Circuit

─────────────

No. 19-70022

─────────────

United States Court of Appeals
Fifth Circuit

**FILED**

May 1, 2025

Lyle W. Cayce
Clerk

Rodney Reed,

*Plaintiff—Appellant,*

*versus*

Bryan Goertz, *Bastrop County District Attorney*; Steve McCraw, *Texas Department of Public Safety*; Sara Loucks, *Bastrop County District Clerk*; Maurice Cook, *Bastrop County Sheriff*,

*Defendants—Appellees.*

─────────────────────────────

ON REMAND FROM
THE SUPREME COURT OF THE UNITED STATES

─────────────────────────────

Before Elrod, *Chief Judge*, and Jones and Higginson, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

Rodney Reed challenges the constitutionality of Texas's postconviction DNA-testing procedures under the Due Process Clause of the Fourteenth Amendment. The first time we heard this case, we concluded that Reed's claim was time-barred in light of our precedent, *Reed v. Goertz*, 995 F.3d 425, 430–31 (5th Cir. 2021), but the Supreme Court reversed, *Reed v. Goertz*, 598 U.S. 230, 235–37 (2023). Turning now to the merits, we conclude that Reed has not pleaded a plausible due process violation because he has not shown that Texas's scheme is unfair or unjust in such a way that

it is fundamentally inadequate to vindicate the substantive right to postconviction DNA testing that it confers upon him. Accordingly, we AFFIRM the district court's dismissal of Reed's claim

## I

## A

Stacy Stites was murdered in 1996.[1] The same day that she was reported missing, her body was found on the side of the road in Bastrop County, Texas. She had been strangled with her own belt, part of which was found near her body. A truck that she shared with her fiancé, Jimmy Fennell, was later found in a parking lot, the other half of Stites's belt nearby. DNA testing matched intact sperm found in Stites's body to Rodney Reed. Reed was charged with Stites's murder. He defended himself on the theory that he and Stites had been carrying out an affair, that the two had engaged in consensual sex prior to Stites's murder, and that someone else—possibly Fennell—had killed her. The jury convicted Reed of capital murder and sentenced him to death.

Since his conviction, Reed has continued to press his innocence through myriad habeas petitions in state and federal court. *See Ex parte Reed*, 670 S.W.3d 689, 710–28 (Tex. Crim. App. 2023) (summarizing Reed's ten state habeas petitions); *Reed*, 995 F.3d at 427–29 (discussing our decision in *Reed v. Stephens*, 739 F.3d 753 (2014) (Reed's first federal habeas petition); *In re Reed*, No. 24-50529 (5th Cir. Nov. 5, 2024) (denying leave to file a second federal habeas petition). All of those petitions have been denied.

---

[1] We do not attempt to recite all of the facts of Reed's case here. For a much more thorough treatment, *see Ex parte Reed*, 670 S.W.3d 689, 699–743 (Tex. Crim. App. 2023).

In 2014, Reed moved in Texas state court under Chapter 64 of the Texas Code of Criminal Procedure for postconviction DNA testing of a number of items found near Stites's body and Fennell's truck. Notably, Reed filed this motion on the same day that his execution date was to be set. *Reed v. State*, 541 S.W.3d 759, 764 (Tex. Crim. App. 2017). Reed's motion sought DNA testing in the form of the new "touch DNA" technique, which can provide genetic information from those who have merely handled an item. *Id.* at 764–66. The state opposed the motion, arguing that it did not satisfy several elements of Chapter 64. *Id.* at 764, 766–77, 769.

The trial court denied Reed's motion, finding Chapter 64's requirements unsatisfied for several reasons. Some pieces of evidence, it concluded, had been "contaminated, tampered with, or altered." *Id.* at 769–70. It determined that there was "not a reasonable likelihood that any of the items Reed sought tested . . . contain[ed] biological material suitable for DNA testing." *Id.* at 770. None of Reed's identified evidence, even when considered altogether, showed that "he would not have been convicted in light of exculpatory results." *Id.* at 773. And that "Reed failed to meet his burden" of establishing that he had not brought his request for DNA testing to unreasonably delay his sentence. *Id.* at 777.

The Court of Criminal Appeals affirmed. *Id.* at 780. It disagreed with the trial court's determination that Reed's identified evidence did not contain biological material suitable for testing, but it agreed with the remainder of the lower court's reasons for denying the requested relief. *See id.* at 770, 780.

Reed filed this lawsuit, a 42 U.S.C. § 1983 action against Bastrop Country District Attorney Bryan Goertz, in August 2019. *Reed*, 995 F.3d at 428. Goertz moved to dismiss Reed's claims under Federal Rule of Civil Procedure 12(b)(6), the Western District of Texas obliged, and we affirmed,

reasoning that Reed's claims were time-barred under our binding precedent. *Id.* at 431 (applying *Russell v. Bd. of Trs.*, 968 F.2d 489, 493 (5th Cir. 1992)). The Supreme Court, however, disagreed, holding that "when a prisoner pursues state post-conviction DNA testing through the state-provided litigation process, the statute of limitations for a § 1983 procedural due process claim begins to run when the state litigation ends." *Reed*, 598 U.S. at 237. Thus, "the statute of limitations began to run when the Texas Court of Criminal Appeals denied Reed's motion for rehearing," and "Reed's § 1983 claim was timely." *Id.*[2]

Reed returned to our court and moved for leave to file supplemental briefing on the merits. We granted that motion, heard argument, and now consider the substance of his due process claim.[3]

## B

In Texas, individuals who wish to gain access to postconviction DNA testing have two methods of recourse available to them. Chapter 64 of the Texas Code of Criminal Procedure governs the first and gives Texas courts the ability to order such testing. *See State v. Patrick*, 86 S.W.3d 592, 595 (Tex.

---

[2] The Court also addressed three "threshold arguments," confirming that: (1) Reed has standing; (2) "the *Ex parte Young* doctrine allows suits like Reed's"; and (3) Reed's procedural due process claim does not offend the *Rooker–Feldman* doctrine. *Id.* at 234–35 (citing *Ex parte Young*, 209 U.S. 123 (1908); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Skinner v. Switzer*, 562 U.S. 521 (2011)).

[3] Reed's complaint identified five claims, alleging: (1) denial of due process; (2) impairment of his access to the courts; (3) cruel and unusual punishment; (4) denial of an opportunity to prove actual innocence; and (5) various violations of the Texas Constitution. Reed, however, has not continued to brief any claims other than his due process claim. And when asked at oral argument whether the remaining claims were still live, Reed's attorney conceded that they "rise and fall" with Reed's ability to show a due process violation. Thus, because we conclude that Reed has not stated a plausible due-process-violation claim, we need not address the remaining claims.

Crim. App. 2002). "A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence that has a reasonable likelihood of containing biological material."[4] Tex. Code Crim. Proc. art. 64.01(a-1). The state must have obtained the evidence "in relation to the offense that is the basis of the challenged conviction" and possessed it during trial. *Id.* art. 64.01(b). The evidence must not have been previously tested (or if it was, there exists a reasonable likelihood that a new testing technique will provide more accurate and probative results, or it was tested by a laboratory the Texas Forensic Science Commission found engaged in faulty testing practices that has since ceased conducting DNA testing). *Id.* And "identity" must have been or currently be "an issue in the case." *Id.* art. 64.03(a)(1)(C).

Three of chapter 64's requirements are particularly relevant here. First, the court must find that the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." *Id.* art. 64.03(a)(1)(A)(ii). Second, the individual seeking testing must demonstrate that he "would not have been convicted if exculpatory results had been obtained through DNA testing." *Id.* art. 64.03(a)(2)(A). And third, that individual must show that he is not attempting to "unreasonably delay the execution of sentence or administration of justice." *Id.* art. 64.03(a)(2)(B).

If all of these elements are met, "the court shall order that the requested forensic DNA testing be conducted." *Id.* art. 64.03(c). And unless

---

[4] In 2011, the Texas legislature amended Chapter 64 to include a definition of "biological material." H.B. 1573, 82nd Leg. § 5 (2011); *see also Reed*, 541 S.W.3d at 779. The statute defines the term as "an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing." Tex. Code Crim. Proc. art. 64.01(a)(1).

the evidence had previously been tested using "faulty testing practices," *see id.* art. 64.03(b-1), those conditions are necessary as well, *id.* art. 64.03(a).

Once the individual seeking DNA testing brings his Chapter 64 motion, the court must provide a copy of the motion to the state. *Id.* art. 64.02(a)(1). In response, the state must either "deliver the evidence to the court" or "explain in writing . . . why [it] cannot" within 60 days. *Id.* art. 64.02(a)(2). And after that period has run, the court may rule on the motion even if the state has failed to respond. *Id.* art. 64.02(b). Appeals of those rulings generally follow Texas's typical appellate course, but appeals by individuals sentenced to death go straight to the Texas Court of Criminal Appeals (CCA). *Id.* art. 64.05.

The second avenue by which an individual might gain access to postconviction DNA testing is through an agreement with the state. That is, a prosecutor may simply agree to perform the requested testing without court intervention. *See, e.g.*, *Skinner v. State*, 484 SW.3d 434, 436 (Tex. Crim. App. 2016). Such an agreement may be reached at any time, and without the burden of Chapter 64's strictures. *See, e.g.*, *Reed*, 541 S.W3d at 765 ("The State and Reed agreed to have [various pieces of evidence] tested outside of Chapter 64's parameters, and the judge entered an agreed order to that effect . . .."). As Goertz has put it, Chapter 64 "does not cabin a prosecutor's discretion" or otherwise "impose any requirements on a prosecutor" because her ability to issue testing is found in "a plenary common law privilege that the Court of Criminal Appeals has recognized." Prosecutors may, however, rely on Chapter 64 and a movant's inability to satisfy its requirements as a reason for declining or opposing testing.[5]

---

[5] Indeed, the Supreme Court reasoned that Reed has standing to bring this case because of his allegation that Goertz "denied access to the [requested] evidence,"

II

A

We review a district court's grant of a motion to dismiss *de novo*. *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 963 (5th Cir. 2019). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We accept all facts as pleaded and construe them in "the light most favorable to the plaintiff." *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017).

B

Reed complains that Chapter 64 is unconstitutional both facially and as applied to him. "Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' *United States v. Salerno*, 481 U.S. 739, 745 (1987) or show that the law lacks 'a plainly legitimate sweep,' *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (alteration in original). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745; *see also id.* (noting that facial-challenge plaintiffs "shoulder [a] heavy burden").

In adjudicating Reed's as-applied challenge, we consider "the particularities of [his] circumstances," *United States v. Giglio*, 126 F.4th 1039, 1045 (5th Cir. 2025) to determine whether Chapter 64 can be constitutionally applied to him, *see Citizens United v. FEC*, 558 U.S. 310, 331

---

"thereby caused [his] injury," and would not be justified in denying DNA testing if a federal court held Chapter 64 unconstitutional. *Reed*, 598 U.S. at 234.

(2010) (noting that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."). That is, we look not just at the contours of the rule at issue and the liberty it supposedly offends, but also to the facts relevant to either or both.

C

To plead a violation of his due process rights, Reed must show that Goertz deprived him of a constitutional right while acting under color of state law. *Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010). "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. But process itself is not a protectable end. *Dist. Atty's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 67 (2009). Rather, for the Due Process Clause to attach and its protections to obtain, a plaintiff must identify a protected "liberty interest." *Id.*

The Constitution does not recognize a "freestanding right to DNA evidence." *Id.* at 72; *see also Skinner*, 562 U.S. at 525 ("*Osborne* rejected the extension of substantive due process to this area . . .."). But the states, as policymakers, may nevertheless elect to confer such a right in its citizens. *Osborne*, 557 U.S. at 56, 67–68; *see also Wolff v. McDonnell*, 418 U.S. 539, 556–58 (1974) ("We think a person's liberty is equally protected [by the Due Process Clause], even when the liberty itself is a statutory creation of the State."). These "state-created right[s] can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981). Thus, if we determine that the Due Process Clause applies, we must then consider what process is due. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

"The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 558. In this context, this

means that the Due Process Clause guarantees that state-created rights, once created, are "not arbitrarily abrogated." *Id.* at 557. But at the same time, states have "flexibility in deciding what procedures are needed" when they choose to extend "help to those seeking relief from convictions." *Osborne*, 557 U.S. at 69. In other words, "due process does not 'dictate the exact form such assistance must assume.'" *Id.* (alteration adopted) (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987). "The dilemma is how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice." *Id.* at 62. But the Supreme Court has clearly instructed that the task of solving this dilemma "belongs primarily to the legislature." *Id.*

These principles in mind, we must decide "whether consideration of [Reed]'s claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fairness in operation.'" *Id.* at 69 (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)); *see also Jauch v. Choctaw Cnty.*, 874 F.3d 425, 431 (5th Cir. 2017) (explaining that *Medina*, not *Mathews v. Eldridge*, 424 U.S. 319 (1976), supplies the correct framework for assessing the constitutionality of state criminal procedure rules (citing *Kaley v. United States*, 571 U.S. 320, 334 (2014))). Put differently, we "may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69.

These strictures "le[ave] slim room for the prisoner to show that the governing state law denies him procedural due process." *Skinner*, 562 U.S. at 525.

III

Turning now to the merits of Reed's arguments, we conclude that the district court correctly granted Goertz's motion to dismiss because Reed has not shown that the process Chapter 64 offers is "fundamentally inadequate to vindicate the substantive rights" it provides. *See Osborne*, 557 U.S. at 69.

Reed seeks a declaratory judgment that Chapter 64 of the Texas Code of Criminal Procedure violates the Due Process Clause of the Fourteenth Amendment.[6] He levies three due process attacks against Chapter 64. First, he argues that the Texas Court of Criminal Appeals has "unfair[ly]" grafted a "non-contamination" requirement onto Chapter 64's "chain-of-custody" requirement that "bars prisoners from accessing DNA testing . . . based on the state's own insufficient procedures." Second, he decries Chapter 64's exoneration requirement "because it excludes consideration of" evidence that might "inculpat[e] a third party." And third, Reed maintains that Chapter 64's no-unreasonable-delay requirement "arbitrarily punishes prisoners for litigating their innocence and requires them to have predicted that a new technology, touch-DNA testing, was available before [Chapter] 64 or the CCA said it was."

Addressing each in turn, we conclude that none of these requirements are fundamentally inadequate to Reed's right to postconviction DNA testing either on their face or as applied to him. And because he would have to show

---

[6] Goertz does not dispute that he acts pursuant to state law, *Kovacic*, 628 F.3d at 213, or that Chapter 64 of the Texas Code of Criminal Procedure extends a right to post-conviction DNA testing to which the Due Process Clause attaches, *Emerson v. Thaler*, 544 F. App'x 325, 327–28 (5th Cir. 2013).

that all three meet that definition to obtain his requested relief,[7] *a fortiori*, we conclude that the district court correctly granted Goertz's motion to dismiss.

## A

Reed's first argument concerns what he calls an "extratextual non-contamination requirement."[8] This aspect of Chapter 64, he says, "is fundamentally unfair and violates due process because it (a) breaks promises Texas postconviction law makes to prisoners seeking to prove their innocence; (b) ignores reliability concerns produced by the prosecution; and (c) arbitrarily applies a different standard to inmates and prosecutors." But these arguments, operating at a very high level of generality, do not convincingly fit this requirement into the "slim" space provided for actions challenging state postconviction DNA testing schemes.[9] *See Skinner*, 562 U.S. at 525.

---

[7] As discussed above, article 64.03 provides that the state court adjudicating a motion for postconviction DNA testing may order that testing "only if" all of its requirements are met. Tex. Code Crim. Proc. 64.03(a). Thus, so long as Reed fails to satisfy at least one requirement that passes constitutional muster, that court would remain statutorily required to deny testing.

[8] Reed does not cite a single case (from the Court of Criminal Appeals or otherwise) for the proposition that the Texas courts have appended some additional, "extratextual" stricture to Chapter 64's chain-of-custody requirement. The high criminal court did use the word "contaminated" in adjudicating this aspect of Reed's postconviction-testing motion. *See Reed*, 541 SW.3d at 769–70. But it does not appear that, by using that term, the court held Reed to some standard other than what is plainly required by Article 64.03(a)(1)(A)(ii). Nor does it appear that, in any event, this matters. *See Skinner*, 562 U.S. at 532 (blessing a challenge to the CCA's "authoritative[] constru[ction]" of Chapter 64); *Wood v. Patton*, 130 F.4th 516, 519 & n.5 (5th Cir. Mar. 7, 2025) (same).

[9] Goertz also argues that Reed forfeited this argument below. But Reed argued before the district court that Chapter 64 "places an impossible burden on applicants with respect to evidence *over which they have no control*." This is the exact argument that he makes on appeal.

Reed first argues that the "non-contamination" requirement reneges on Texas's promise of providing post-conviction DNA testing because it makes that option hinge on "the state's own handling and storage of evidence." It is "fundamentally unfair," he asserts, to foreclose testing due to deficiencies on the part of the state, especially "because DNA testing can yield highly probative information even where crime-scene evidence was supposedly contaminated . . .."

Putting aside the fact that Reed cites no caselaw for this proposition, it seems both inevitable and necessary that the state be tasked with storing evidence and that contaminated evidence, regardless of fault, be treated with increased scrutiny. It is not lost on us that this system might sometimes disadvantage individuals like Reed through no fault of their own. But the process this system offers is not arbitrary. Someone must maintain custody of potentially exculpatory evidence, and it is hard to imagine this someone being anyone other than the government. Pair all that with the reality that at least some mishandling of evidence is inevitable, and you end up with a government-run system that, at least sometimes, yields evidence that has been "contaminated, tampered with, or altered" in some way. *See Reed*, 541 S.W.3d at 769. And because we afford government actors a presumption of good faith in the exercise of their official duties, *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009), we do not think that entrusting this responsibility to the government is fundamentally unfair on its face.

All of this does not mean that individuals who draw such a short straw will be without recourse. It might very well be the case that an individual who shows that the state mishandled his evidence, by rebutting the presumption of good faith, would have a viable due process claim. But absent some showing of bad faith or bad conduct, we cannot see how committing the custody of potentially exculpatory evidence to the state is fundamentally inadequate to vindicate the right to the possibility of postconviction testing

that it offers—especially given the Supreme Court's emphasis that the power to define these contours is vested in the state legislature. *See Osborne*, 557 U.S. at 62. And because Reed does not make such a showing, he has not shown that the so-called "non-contamination" requirement renders Chapter 64 fundamentally inadequate as applied to him.

The remainder of Reed's "non-contamination" arguments fare no better. First, he complains that Chapter 64 places the chain-of-custody burden on him, "hold[ing] supposed contamination against the prisoner even though the state is responsible for the condition of the evidence . . .." But Reed's claim "must be analyzed in light of the fact that he has already been found guilty at a fair trial." *Id.* at 69. "Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears," *Herrera v. Collins*, 506 U.S. 390, 399 (1993), and the state is then justified in placing certain burdens on the convicted individual, *Osborne*, 557 U.S. at 68–69. Under this framework, the Supreme Court approved of Alaska's postconviction-DNA-testing scheme, which places a clear-and-convincing burden on the person seeking testing. *Id.* at 68. Failing to even attempt to distinguish the Alaska statute, Reed does not demonstrate why a different result should obtain here.

Next, Reed argues that "law enforcement procedures" might themselves "cause grave reliability concerns at the defendant's expense." He attempts to draw an analogy to due process prohibitions on the prosecution's use of false evidence or testimony, *see Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959) and "unnecessarily suggestive identification procedure[s]," *see Perry v. New Hampshire*, 565 U.S. 228, 241 (2012). But these comparisons fail because the analogy is simply too general to be convincing. Not only so, but they also ignore the fact just discussed that postconviction relief procedures are not held to as strict a standard as trial

procedures when challenged for supposed violations of due process. *Osborne*, 557 U.S. at 69.

Reed cites to us the Supreme Court's reminder in *Perry* that a "primary aim" of our due process rules "is to deter law enforcement use of improper [procedures] in the first place." *Perry*, 565 U.S. at 241. But the very next line in *Perry* belies Reed's argument: "This deterrence rationale is inapposite in cases . . . where there is no improper police conduct." *Id.* Reed might disagree with the state's handling of evidence, and we might know better now than we did then about how to do it. But none of this means that Chapter 64, as written or construed, is "fundamentally inadequate" to vindicate an individual's right to postconviction DNA testing. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (recognizing that the Due Process Clause is not violated when "there [is] no suggestion of bad faith" and law enforcement conduct "can at worst be described as negligent").

Last, Reed complains that the "non-contamination requirement unfairly imposes a more stringent chain-of-custody burden on inmates . . . than on prosecutors . . . at trial." But for the same reasons discussed above, it is unclear how this violates procedural due process when there is no requirement that postconviction relief procedures be held to the same standards as procedures at trial. *Osborne*, 557 U.S. at 69. It is true, as Reed points out, that we have interpreted the chain of custody requirement contained within the federal DNA-testing statute, *see* 18 U.S.C. § 3600(a)(4), to *not* impose a more exacting standard than that imposed at trial. *United States v. Fasano*, 577 F.3d 572, 576 (5th Cir. 2009). But *Fasano* is a case turning on statutory interpretation, not on the strictures of procedural due process. That this court has interpreted the *federal* DNA-testing statute one way does not mean that a state court interpreting a *state* DNA-testing statute a different way results in a state procedure that violates due process.

Thus, Reed does not demonstrate that article 64.03(a)(1)(A)(ii) is fundamentally inadequate to vindicate his right to postconviction DNA testing. It is not enough to disagree with how the state has elected to use its permissible discretion or to complain that it has misapplied its own standards. Instead, Reed would have to show that those standards are fundamentally unfair or unjust in some way, but he has simply failed to do so.

B

Reed next challenges Chapter 64's exculpatory-results requirement. He argues that "the CCA's construction of the exoneration inquiry prevents an inmate from obtaining DNA testing that, together with posttrial developments, can show his innocence by inculpating a third party."

Reed's first issue concerns the CCA's interpretation of article 64.03(a)(2)(A). The statute requires the individual seeking testing to show that he "would not have been convicted if exculpatory results had been obtained through DNA testing." Tex. Code Crim. Proc. art. 64.03(a)(2)(A). And the CCA has interpreted "exculpatory results" to mean "only results excluding the convicted person as the donor of" the biological material at issue. *Reed*, 541 S.W.3d at 774 (quoting *Holberg v. State*, 425 S.W.3d 282, 287 (Tex. Crim. App. 2014)). To Reed, this interpretation is fundamentally unfair because it precludes testing of material that might exculpate the convicted individual by "fail[ing] to exclude another suspect."

We disagree. This exoneration requirement exists to ensure that the "DNA tests will prove a convicted person's innocence" and not "merely muddy the waters." *Kutzner v. State*, 75 S.W3d 427, 438, n27 (Tex. Crim. App. 2002). Because evidence that "fails to exclude another suspect" does not necessarily fall into the former category, we cannot say that this requirement is fundamentally unfair. To start, *Osborne* approved of materiality requirements, recognizing both that they are "common" features

15

of DNA-testing schemes and that "they are not inconsistent with the 'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness.'" *Osborne*, 557 U.S. at 63, 70 (quoting *Medina*, 505 U.S. at 446, 448). But Reed's proposed rule runs headlong into this blessing. He argues, essentially, that due process requires the state to test evidence on the mere allegation that someone else's DNA might also be identified. But as Goertz puts it, "if the CCA were required to presume another suspect's DNA was on every piece of evidence," it would be "hard to imagine a case in which [it] would not grant DNA testing." *State v. Swearingen*, 424 S.W.3d 32, 39 (Tex. Crim. App. 2014). Reed's argument that it is unconstitutional to require the evidence to exculpate the movant therefore contravenes *Osborne*. Said differently, if Reed is correct, there would be no room for the materiality requirements the Supreme Court has already said are permissible. Accordingly, we cannot agree with him that due process requires the state to test evidence that would not demonstrate a reasonable probability of innocence.

Not only so, the facts of Reed's own case belie both his facial and as-applied challenge. The whole premise of Reed's claim is that favorable results "would fail to exclude" Fennell, his proffered suspect. But even if Fennell's DNA was found on the items for which Reed sought testing, that finding would show nothing more than the fact that Fennell drove his own truck or had touched his fiancé's belt. *See Reed*, 541 S.W.3d at 773–77. It can hardly be said that these results would be exculpatory. Thus, it does not seem arbitrary or fundamentally unfair to deny Reed testing under Chapter 64's exculpatory-results requirement, so we conclude that this requirement neither violates the Due Process Clause facially or as applied to Reed.

As somewhat of an afterthought, Reed also criticizes the CCA's requirement that the exoneration inquiry exclude consideration of posttrial factual developments. He cites *Holmes v. South Carolina*, 547 U.S. 319, 327

(2006) for the proposition that evidence "that someone else committed the crime" is generally admissible. And he points to *Chambers v. Mississippi*, 410 U.S. 284, 301 (1973) to demonstrate that he has a "fundamental right" to present that sort of evidence. But again, these arguments discount the fact that the Due Process Clause requires much less of postconviction procedures than of preconviction ones. *Osborne*, 557 U.S. at 69. Not only so, but a holding that due process forces states to augment the trial record would be inconsistent with well-established precedent in other contexts. For example, direct appeals are generally limited to the record developed at trial. *See, e.g.*, *Trevino v. Thaler*, 569 U.S. 413, 422 (2013). And the same is true for federal habeas review. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). If due process permits of such a limitation in the federal courts, "the Due Process Clause of the Fourteenth Amendment cannot possibly require more of a state court system." *See Smith v. Phillips*, 455 U.S. 209, 218 (1982).

Accordingly, we conclude that the CCA's interpretation of article 64.03(a)(2)(A) is not fundamentally inadequate to vindicate postconviction-DNA-testing rights whether on its face or as applied to Reed.

## C

Finally, Reed urges that the CCA's interpretation of Chapter 64's diligence requirement violates due process because it (1) "arbitrarily punishes prisoners for developing evidence of innocence and (2) "prevent[s] any prisoner seeking touch-DNA testing after the 2011 amendments from obtaining testing."[10] But we cannot tell that either is true. *See Reed*, 541

---

[10] Goertz also argues that Reed forfeited this argument. Reed only briefed his due process claim before us, even conceding at oral argument that his remaining claims "rise and fall" with his ability to show a due process claim. Because Reed argues only the due process claim on appeal, he has forfeited all other claims. *See United States v. Joseph*, 102 F.4th 686, 691 (5th Cir. 2024) (quoting *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th

S.W.3d at 778 (stating "Article 64.03(a)(2)(B) does not contain set criteria a court must consider" in making this determination; such determinations are an "inherently fact-specific and subjective inquiry" for which there is no "definitive criteria."). Similarly, in *Osborne*, the state law at issue required a showing that the requested DNA evidence was newly available, *diligently pursued*, and sufficiently material. *Osborne*, 557 U.S. at 70.

To evidence his first argument, Reed cites nothing other than the CCA's opinion in his own case. But even then, it is less than clear that the court "punish[ed] [him] for exercising his legal rights." To the contrary, it considered (1) Reed's ""piecemeal approach' in his post-conviction litigation," (2) Reed's failure to seek a testing agreement until we denied him a certificate of appealability, (3) that "he took four months" to facilitate the execution of that agreement, and (4) that Reed filed his motion "on the same day the judge heard the State's motion to set an execution date filed three months earlier." *Reed*, 541 S.W.3d at 777–79; *see also id.* at 777–78 (enumerating the trial court's seven reasons for denying testing). To put it simply, the CCA's application of the law hardly seems arbitrary, and it certainly gives no indication that it has or would "punish" any other postconviction-DNA-testing applicant. Because Reed has not shown a fundamentally unfair application of the law in his case (much less facially), we disagree with his contention that the no-undue-delay provision offends due process. *See Wood*, 130 F.4th at 523 (rejecting similar challenge when challenger could not show that a certain factor was "dispositive (or even key) . . . in finding unreasonable delay").

---

Cir. 2021)) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal."); *see also* FED. R. APP. P. 28(a)(8)(A), (B).

Reed's second critique is no more persuasive. He argues that the CCA "construed the unreasonable-delay requirement to hold against prisoners any pre-2011 delay in seeking touch-DNA testing even though it wasn't clear that Article 64 allowed touch-DNA testing until the law was amended in 2011."[11] This construction, he urges, "punishes prisoners for not being fortunetellers." But the problem with Reed's argument is that he brings no evidence of such construction. *See Wood*, 130 F.4th at 523 ("*Reed* did not create a new rule; it restated the existing rule . . ..") . The CCA did note that Reed could have known of the possibility of his claim: "Chapter 64 had existed with only slight variations for over thirteen years at the time Reed filed his motion, and there does not appear to be any factual or legal impediments that prevented Reed from availing himself of post-conviction DNA testing earlier." *Reed*, 541 S.W.3d. at 779 (footnote omitted). Citing *Swearingen v. State*, 303 S.W.3d 728, 732–33 (Tex. Crim. App. 2017), the trial court reasoned that Reed could have known that "biological material" included touch DNA "at a much earlier time." *Id.*[12] But as we discussed above, this point was not dispositive as the CCA spent several pages discussing other reasons for its undue-delay finding. And does Reed identify any other example of a motion being denied on this basis. Thus, for much the same reasons, Reed has not shown a due process violation here either.

---

[11] As Reed helpfully explains, the 2011 amendment added "skin tissue or cells," "fingernail scrapings," and "other identifiable biological evidence that may be suitable for forensic DNA testing" to the definition of "biological material," "thus capturing types of biological material suitable for touch-DNA testing." *See supra* at note 4.

[12] The trial court noted on the record that Reed's attorney at the time was also counsel for the movant in the *Swearingen* case.

IV

The question we face today is whether Chapter 64 of Texas's Code of Criminal Procedure "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fairness in operation'" such that it is "fundamentally inadequate to vindicate" the right to postconviction DNA testing that it provides. *See Osborne*, 557 U.S. at 69 (quoting *Medina*, 505 U.S. at 446, 448). As we have drawn out, we conclude that it does not. Reed, therefore, has not stated a claim upon which relief could be granted, and the district court correctly granted Goertz's motion to dismiss for that reason. We AFFIRM.