No. 19-70022

In the
# United States Court of Appeals
## for the Fifth Circuit

RODNEY REED,

*Plaintiff-Appellant,*

v.

BRYAN GOERTZ,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Western District of Texas, No. 1:19-cv-794,
Hon. Lee Yeakel, *United States District Judge*

## PLAINTIFF-APPELLANT RODNEY REED'S
## PETITION FOR REHEARING EN BANC

Cliff C. Gardner
Michelle L. Davis
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King St.
Wilmington, DE 19801

Barry C. Scheck
Jane Pucher
THE INNOCENCE PROJECT
40 Worth St., Ste. 701
New York, NY 10013

Andrew F. MacRae
MACRAE LAW FIRM PLLC
3267 Bee Cave Rd., Ste. 107,
  PMB 276
Austin, TX 78746

Parker Rider-Longmaid
  *Counsel of Record*
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

Jeremy Patashnik
Sarah Leitner
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Plaintiff-Appellant Rodney Reed*

# CERTIFICATE OF INTERESTED PERSONS

*Reed v. Goertz*, No. 19-70022

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## I. Parties

The Plaintiff-Appellant is Rodney Reed, and the Defendant-Appellee is Bryan Goertz. Steve McCraw, Sarah Loucks, and Maurice Cook were Defendants in the district court, but were terminated as parties on October 1, 2019.

## II. Interested parties

### A. Counsel for Plaintiff-Appellant

Counsel for Plaintiff-Appellant in the litigation are:

- Parker Rider-Longmaid, Cliff C. Gardner, Raza Rasheed, Jason Liberi, Michelle L. Davis, Nicole DiSalvo, Jeremy Patashnik, Hanaa Khan, and Sarah Leitner; Skadden, Arps, Slate, Meagher & Flom LLP

- George Kendall and Nicola Cohen; Squire Patton Boggs (US) LLP

- Barry C. Scheck and Jane Pucher; The Innocence Project

- Andrew F. MacRae; MacRae Law Firm, PLLC

- Robert Alan Weber; Chipman Brown Cicero & Cole, LLP

- Quinncy McNeal; Husch Blackwell LLP

**B.      Counsel for Defendant-Appellee**

Counsel for Defendant-Appellee in the litigation are:

- Travis Bragg, Matthew Dennis Ottoway, Gwendolyn Suzanne Vindell, and Ann Hahn; Office of the Attorney General of Texas

**C.      Other interested parties**

To counsel's knowledge, there are no additional firms or persons with an interest in the outcome of the litigation.


Dated: May 15, 2025           */s/ Parker Rider-Longmaid*
                              Parker Rider-Longmaid

# RULE 40(b)(2) STATEMENT

Rodney Reed, a death-row inmate who has steadfastly maintained his innocence for over 25 years, respectfully requests en banc review because this case involves a "question[] of exceptional importance." Fed. R. App. P. 40(b)(2)(D). Reed argues that the Texas Court of Criminal Appeals' (CCA) authoritative construction of Texas's postconviction DNA-testing statute (Texas Code of Criminal Procedure Article 64) violates the Constitution's due-process guarantee.

District Attorney Bryan Goertz relies on the CCA's construction of Article 64 to deny Reed DNA testing of the belt used to strangle Stacey Stites in 1996. Reed was convicted of murdering Stites and sentenced to death. Since trial, Reed has developed a "considerable body of evidence" undermining the state's theory and inculpating another suspect, Stites' fiancé Jimmy Fennell. *Reed v. Texas*, 140 S. Ct. 686, 687 (2020) (statement of Sotomayor, J., respecting the denial of certiorari). Testing the belt could prove Reed's innocence. The killer exerted "great force" on the belt for over three minutes, *Ex parte Reed*, 271 S.W.3d 698, 705-06 (Tex. Crim. App. 2008), so the belt likely contains a high concentration of the killer's DNA. Reed first requested

testing of the belt in 1999. More than a quarter century later, the belt remains untested. And Goertz has no constitutional reason to deny Reed's request.

1. Texas grants prisoners a liberty interest in proving their innocence with new evidence, including through postconviction DNA testing. *See* Tex. Code Crim. Proc. art. 11.071(5)(a)(1). The Constitution's due-process guarantee thus requires Texas to provide adequate procedures "to vindicate" that substantive right. *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 69 (2009).

2. Article 64 violates due process.

*First*, the CCA grafted a non-contamination requirement onto Article 64's chain-of-custody provision. That requirement is arbitrary and illogical. Among other things, it rests on the scientifically incorrect assumption that contaminated evidence cannot yield reliable DNA results. Indeed, Texas has rigorous protocols for detecting, accounting for, and reporting DNA results despite contamination. That's why contaminated evidence is admissible in Texas trials, including when the prosecution introduces it.

*Second*, the CCA construes Article 64's exoneration requirement—that an "exculpatory result[]" would show that the prisoner "would not have been convicted," Tex. Code Crim. Proc. art. 64.03(a)(2)(A)—to exclude

consideration of posttrial developments or whether a result would inculpate a third party. That means, as here, that a district attorney can rely on disproven or discredited trial testimony to deny testing or can deny testing that would prove another suspect's guilt.

*Finally*, the CCA's construction of Article 64's unreasonable-delay requirement punishes prisoners for exercising their right to prove their innocence and for not predicting changes in the law.

**3.** Although all three provisions Reed challenges violate due process, the non-contamination requirement's unconstitutionality by itself entitles Reed to relief. That's because a judgment declaring that requirement unconstitutional would significantly increase Reed's likelihood of securing testing of the belt. Goertz wouldn't be able to rely on the exoneration or unreasonable-delay requirements to refuse testing. Indeed, an exculpatory DNA result from the murder weapon would demonstrate Reed's innocence, and Reed has been asking for testing since 1999.

The consequences are life-or-death for Rodney Reed. This case merits en banc review.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

RULE 40(b)(2) STATEMENT ............................................................... iii

TABLE OF AUTHORITIES ............................................................. viii

STATEMENT OF THE ISSUE MERITING REHEARING EN BANC.............1

STATEMENT OF PROCEEDINGS AND DISPOSITION ................................1

STATEMENT OF FACTS ........................................................................5

ARGUMENT........................................................................................5

    A.    The Constitution's due-process guarantee protects state-created liberty interests in proving one's innocence using newly discovered evidence, including through DNA testing. ................................................................5

    B.    Article 64 violates due process. .......................................6

        1.    The non-contamination requirement violates due process because it arbitrarily bars prisoners from obtaining exculpatory results.................................6

        2.    The exoneration requirement violates due process because it prevents prisoners from demonstrating their innocence using postconviction developments and evidence inculpating a third party. ............................11

        3.    The unreasonable-delay requirement violates due process because it punishes prisoners for exercising their rights and for not predicting changes in the law. ........................................................................13

C.    Holding Article 64's non-contamination requirement unconstitutional would redress Reed's injury, even if no other provision of Article 64 violates due process. .....................14

    1.    If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the exoneration requirement to deny testing of the murder weapon. ....................................................................15

    2.    If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the unreasonable-delay requirement to deny testing of the murder weapon. ..........................................................16

CONCLUSION ........................................................................................18

CERTIFICATE OF COMPLIANCE ....................................................19

CERTIFICATE OF SERVICE .............................................................20

# TABLE OF AUTHORITIES

Page(s)

<small>CASES</small>

*Chambers v. Mississippi,*
   410 U.S. 284 (1973) ................................................................12

*District Attorney's Office for the Third Judicial District v. Osborne,*
   557 U.S. 52 (2009) ...............................................................iv, 5, 6, 9

*Dossett v. State,*
   216 S.W.3d 7 (Tex. App. 2006) .........................................................8

*Doyle v. Ohio,*
   426 U.S. 610 (1976) ................................................................13

*Ex parte Reed,*
   271 S.W.3d 698 (Tex. Crim. App. 2008) ................................iii, 1, 2,
   ....................................................................... 9, 10, 15, 16

*Ex parte Reed,*
   670 S.W.3d 689 (Tex. Crim. App. 2023) .......................................12

*Federal Communications Commission v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ................................................................14

*Harvey v. Horan,*
   285 F.3d 298 (4th Cir. 2002) ......................................................12

*Holmes v. South Carolina,*
   547 U.S. 319 (2006) ...............................................................6, 7

*Kelson v. Clark,*
   1 F.4th 411 (5th Cir. 2021) ........................................................15

*Medina v. California,*
   505 U.S. 437 (1992) ................................................................5, 6

*Napue v. Illinois,*
   360 U.S. 264 (1959) ..................................................................6

*Reed v. Goertz,*
   598 U.S. 230 (2023) ...............................................................4, 15

- viii -

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Reed v. Goertz*,
    995 F.3d 425 (5th Cir. 2021) ................................................................4

*Reed v. Texas*,
    140 S. Ct. 686 (2020) ............................................................... iii, 2

*Skinner v. Switzer*,
    562 U.S. 521 (2011) ............................................................................5

*State v. Pratt*,
    842 N.W.2d 800 (Neb. 2014) ............................................................11

*United States v. Fasano*,
    577 F.3d 572 (5th Cir. 2009) ...........................................................10

*Wolff v. McDonnell*,
    418 U.S. 539 (1974) ............................................................................6

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. amend. XIV ............................................................................5

42 U.S.C. § 1983 .........................................................................................3

Tex. Code Crim. Proc. art. 11.071(5)(a)(1) .................................... iv, 5

Tex. Code Crim. Proc. art. 38.43(b) ........................................................8

Tex. Code Crim. Proc. art. 38.43(c)(2)(A) ..............................................8

Tex. Code Crim. Proc. art. 64 ................................................ iii, iv, v, 1,
    ............................................................................ 3, 4, 6, 7, 8, 9,
    .................................................................... 11, 13, 14, 15, 16

    Tex. Code Crim. Proc. art. 64.01(a)(1) (2011) ................................14

    Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii) ................................6, 7

    Tex. Code Crim. Proc. art. 64.03(a)(2)(A) ......................iv, v, 11, 12

    Tex. Code Crim. Proc. art. 64.03(a)(2)(B) .....................................13

Fed. R. App. P. 40(b)(2)(D) .................................................................. iii

Tex. R. Evid. 901(a) ..................................................................................8

**STATEMENT OF THE ISSUE MERITING REHEARING EN BANC**

Whether Article 64, as authoritatively construed by the CCA, violates due process, on its face or as applied, because the law allows the state to arbitrarily deny prisoners postconviction DNA testing—including Rodney Reed, a death-row inmate who has sought testing of the belt used to murder Stacey Stites since 1999.

**STATEMENT OF PROCEEDINGS AND DISPOSITION**

**A.    1.**    Reed has been on death row since 1998 for a crime he steadfastly maintains he did not commit. In 1996, Stites, a 19-year-old white woman, was found dead on the side of a Bastrop County road. *Reed*, 271 S.W.3d at 702. She had been strangled with her belt. *Id.* at 706.

Jimmy Fennell, a white police officer engaged to Stites, was the last person known to have seen her alive. *Id.* at 703. But police targeted Reed, a Black man, after finding three sperm matching Reed's DNA inside Stites' vaginal tract. *Id.* at 705, 710. Reed protested his innocence, explaining that he and Stites were having an affair.

The state's theory at trial was that Reed and Stites were strangers, so he must have raped and murdered her. The prosecution argued that Stites was killed around 3 a.m. and presented expert testimony that sperm remains

intact inside a vaginal tract for under 26 hours. *Id.* at 705. "This evidence thus tended to inculpate Reed (by suggesting that he must have had sex with Stites very soon before her death) and exculpate Fennell (by indicating that Stites died after Fennell claimed to have seen her last)." *Reed*, 140 S. Ct. at 687 (statement of Sotomayor, J., respecting the denial of certiorari). An all-white jury convicted Reed, who received a death sentence.

    **2.** Over the last two decades, Reed has developed a "considerable body of evidence" that he is innocent. *Id.* For example:

- The pathologist who testified at trial recanted his testimony about Stites' time of death and the likelihood of sexual assault. ROA.73-76.

- The agencies that employed the state's experts who testified that sperm cannot survive for over 26 hours inside the vaginal tract issued letters discrediting that testimony. ROA.83, 85-86.

- Fennell pleaded guilty to abducting and sexually assaulting a person in his police custody. ROA.169-70. Another inmate came forward to say that Fennell confessed to murdering Stites because she was cheating on him with a Black man. ROA.620-22.

- At a 2021 state-court hearing, several of Stites' coworkers testified that Reed and Stites knew each other and were intimately involved. SA484:2-23, SA490:3-19, SA523:18-SA524:16, SA544:23-SA545:11, SA463:20-SA464:25, SA459:24-SA460:16. ("SA" refers to the Special Appendix filed in *In re Reed*, No. 24-50529 (5th Cir. Nov. 5, 2024), ECF No. 4.)

- Witnesses testified at that hearing that Stites and Fennell had a tumultuous, violent relationship. SA501:14-SA502:23, SA440:10-25, SA449:3-16, SA542:20-SA544:22, SA471:7-SA472:25, SA483:1-21, SA513:16-SA514:1, SA517:6-18. A life-insurance agent through whom Stites had applied for a policy testified that Fennell told Stites: "If I ever catch you messing around on me, I will kill you and nobody'll know that I was the one that did it." SA444:22-SA445:12.

**B.** **1.** Reed first sought and was denied postconviction DNA testing—including of the belt—in 1999. ROA.172. In 2014, Reed filed another motion in Texas trial court, under Article 64, seeking to test the belt and other key evidence. ROA.277-78. The trial court denied Reed's motion, ROA.206-222, and the CCA affirmed, ROA.271.

**2.** **a.** Reed sued in federal court under 42 U.S.C. § 1983, challenging Article 64 as authoritatively construed by the CCA. ROA.857. Reed's amended complaint sets out three ways Article 64 violates due process. *See* Reed Suppl. Br. 8-10 (ECF No. 103). *First*, Article 64's extratextual non-contamination requirement is unconstitutional because it arbitrarily forecloses "relief to any person convicted before rules governing the State's handling and storage of evidence were put in place." ROA.177-78, 183-84. *Second*, Article 64's exoneration requirement is unconstitutional because it permits consideration of discredited trial evidence while prohibiting consideration

of DNA-testing results inculpating a third party. ROA.186-88. *Finally*, Article 64's unreasonable-delay requirement is unconstitutional because it punishes prisoners who have diligently sought to develop evidence of their innocence and who could not have known before Article 64's amendment that the statute made touch-DNA testing available. ROA.178-79.

**b.** The district court dismissed Reed's suit for failure to state a claim. ROA.869. This Court affirmed because it found Reed's suit untimely. *Reed v. Goertz*, 995 F.3d 425, 430-31 (5th Cir. 2021). The Supreme Court reversed. *Reed v. Goertz*, 598 U.S. 230, 232 (2023).

**3.** On remand, this Court affirmed the dismissal on the merits. The panel held that Reed needed to show that Article 64's non-contamination, exoneration, and unreasonable-delay requirements all violate due process. Op. 10-11 & n.7. And it concluded that all three requirements are constitutional. Op. 10-11. *First*, the panel held that, absent a showing of bad faith on the state's part, it is not fundamentally unfair to impose a non-contamination requirement even when the state's mishandling potentially contaminated the evidence. Op. 12. *Second*, the panel held that a result that fails to exclude Fennell would not necessarily be exculpatory, so Reed cannot show that the exoneration requirement is unconstitutional as applied. Op. 15-17. *Finally*,

the panel reasoned that the CCA's application of the unreasonable-delay requirement "hardly seems arbitrary" and thus was not fundamentally unfair. Op. 17-19.

## STATEMENT OF FACTS

Relevant facts are set out above (at 1-3).

## ARGUMENT

A.    **The Constitution's due-process guarantee protects state-created liberty interests in proving one's innocence using newly discovered evidence, including through DNA testing.**

The Fourteenth Amendment "imposes procedural limitations on a State's power to take away protected entitlements." *Osborne*, 557 U.S. at 67. Thus, where state law gives a prisoner "a liberty interest in demonstrating his innocence with new evidence," the due-process guarantee requires the state to provide procedures for "the realization of the parent right." *Id.* at 68. Here, Texas gives prisoners a right to prove their innocence with new evidence, Tex. Code Crim. Proc. art. 11.071(5)(a)(1), so Texas must provide adequate procedures "to vindicate" that right. *Osborne*, 557 U.S. at 68-69; *see Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

A state's DNA-testing law is inadequate if it "'offends some principle of justice so rooted in the traditions and conscience of our people as to be

ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Osborne*, 557 U.S. at 69 (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). The "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Due process is thus "abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary or disproportionate to the purposes they are designed to serve.'" *Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006). The due-process guarantee also prohibits the government from corrupting the truth-finding process by, for example, relying on false evidence. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

**B.    Article 64 violates due process.**

Article 64's non-contamination, exoneration, and unreasonable-delay requirements violate due process.

**1.    The non-contamination requirement violates due process because it arbitrarily bars prisoners from obtaining exculpatory results.**

Article 64 requires the prisoner to establish that evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." Tex.

- 6 -

Code Crim. Proc. art. 64.03(a)(1)(A)(ii). The CCA construes that provision to contain an extratextual non-contamination requirement that forecloses relief if the evidence might have been contaminated by, for example, ungloved handling. *See* ROA.286-88. That requirement arbitrarily denies testing of probative evidence.

    **a.**    Denying testing based on purported contamination is arbitrary, illogical, and disproportionate to whatever purpose the non-contamination requirement is designed to serve. *See Holmes*, 547 U.S. at 324-25.

    *First*, the requirement rests on the incorrect assumption that contaminated evidence cannot yield reliable results. But testing a contaminated sample can still be highly probative. *See* Br. of Chase Baumgartner 6, *Reed*, 598 U.S. 230 (No. 21-442). For example, the Texas Department of Public Safety has rigorous protocols for detecting, accounting for, and reporting results despite contamination. Tests can be conducted to reveal the concentration of DNA for a given profile, and laboratories can "deconvolute" a DNA mixture to account for known contaminators. *Id.* at 9, 13-16.

    *Second*, the non-contamination requirement unfairly imposes a more-stringent burden on prisoners seeking DNA testing than on prosecutors introducing the evidence at trial. Elsewhere, Texas shows that it understands

DNA science and *agrees* with it. If the chain-of-custody requirement is satisfied, prosecutors can introduce contaminated DNA evidence at trial—when a defendant's constitutional rights are at their zenith. *See* Tex. R. Evid. 901(a); *Dossett v. State*, 216 S.W.3d 7, 20-22 (Tex. App. 2006). If contaminated evidence can yield probative DNA-testing results at trial (it can), it can do so after trial, too.

*Third*, denying testing because of potential contamination is circular. The only way to prove innocence through DNA testing is to obtain those testing results. But there's no way to get testing under Article 64 when the evidence is supposedly contaminated, because the non-contamination requirement bars the very testing required to prove that the supposed contamination does *not* prevent reliable results. And testing would also reveal whether the evidence *was* contaminated.

*Fourth*, the state—not the defendant—is responsible for preserving crime-scene evidence, yet the non-contamination requirement holds the prisoner responsible for the state's failure to properly handle evidence. *See* Tex. Code Crim. Proc. art. 38.43(b), (c)(2)(A). That lets the state prevent prisoners from obtaining postconviction DNA testing simply by improperly handling evidence.

In sum, the non-contamination requirement arbitrarily excludes probative and reliable results, undermining the reliability of the postconviction procedures' truth-seeking function.

**b.** Reed's case shows how Article 64's non-contamination requirement "transgresses" "recognized principle[s] of fundamental fairness." *Osborne*, 557 U.S. at 69.

The CCA ruled that the belt couldn't be tested under Article 64 because it was "handled by ungloved" court personnel. ROA.286-88. But denying testing for that reason arbitrarily prevents Reed from obtaining a potentially exculpatory result. Investigators concluded that "great force had been applied" to Stites' neck, *Reed*, 271 S.W.3d at 705, and prosecutors told the jury that the killer "strangled the life" out of Stites with the belt for "three to four minutes," SA49, SA61; *see* Oral Arg. 12:00-12:35. Thus, testing likely would reveal a high concentration of the killer's DNA in the belt's webbing. If Reed's DNA is not on the belt, but there is a high concentration of Fennell's (or someone else's), that would strongly suggest Reed is innocent.

Potential contamination wouldn't diminish the belt's evidentiary value. DNA due to contamination is likely to have been deposited in much smaller concentrations than DNA from the killer, who exerted "great force"

on the belt for over three minutes. *Reed*, 271 S.W.3d at 705-06. Thus, DNA from court personnel wouldn't make results unreliable. Indeed, "[e]ven in this worst-case scenario of developing the most complex, contaminated DNA profile that can still be interpreted," Texas Department of Public Safety analysts "could accurately include or exclude [Reed] or Mr. Fennell with above 95% accuracy." Baumgartner Br. 18.

**c.** In interpreting the federal and Nebraska postconviction DNA-testing statutes, both this Court and the Nebraska Supreme Court have explained why a non-contamination requirement would defeat those statutes' purposes. Although those rulings aren't due-process holdings, the reasoning shows why a non-contamination requirement is illogical and arbitrary.

In *United States v. Fasano*, 577 F.3d 572, 576 (5th Cir. 2009), this Court refused to read a non-contamination requirement into the federal postconviction DNA-testing statute, because the statute doesn't "impose a more exacting standard" beyond the "showing of the chain of custody." Indeed, "much of the uncertainty inherent in this predictive exercise can be dispelled only by the tests a petitioner is seeking." *Id.* Stated differently, it's impossible to know whether testing will be probative without testing the sample, no matter whether it is contaminated.

Likewise, in *State v. Pratt*, 842 N.W.2d 800, 811 (Neb. 2014), the Nebraska Supreme Court refused to read a non-contamination requirement into Nebraska's postconviction DNA-testing statute. *See* Reed Br. 32-33 (ECF No. 28); Oral Arg. 16:58-17:28. Interpreting the statute "as demanding that the biological evidence was secured in a way likely to avoid accidental contamination with extraneous DNA" would "undermine[]" the statute's "express purposes." *Pratt*, 842 N.W.2d at 811. The court reasoned that a postconviction DNA-testing statute wouldn't be "drafted to prevent discovery of relevant exculpatory DNA evidence." *Id.* at 811-12. "Despite any mixtures with extraneous DNA," the court explained, "a partial or full profile of the perpetrator's DNA could still be obtained" because there was an adequate chain of custody which gave analysts "knowledge of the past storage and handling" of the evidence. *Id.* at 811.

2.     **The exoneration requirement violates due process because it prevents prisoners from demonstrating their innocence using postconviction developments and evidence inculpating a third party.**

Article 64's exoneration requirement also violates due process. That provision requires the prisoner to establish that he "would not have been convicted if exculpatory results had been obtained through DNA testing."

Tex. Code Crim. Proc. art. 64.03(a)(2)(A). The CCA holds that the inquiry must ignore posttrial developments discrediting trial evidence and must limit exculpatory DNA-testing results to those "excluding the convicted person as the donor of the material," even if the results could inculpate someone else but not exclude the prisoner. ROA.296. That's fundamentally unfair.

a.     The opportunity to present evidence tending to inculpate a third party is a "critical" part of the "fundamental" right "of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The CCA recognizes that, too. In denying Reed habeas relief, the CCA faulted him for failing (in its view) to "affirmatively demonstrate[]" his innocence by "show[ing] that someone else" murdered Stites. *Ex parte Reed*, 670 S.W.3d 689, 761 (Tex. Crim. App. 2023). The state cannot ignore those principles in the postconviction DNA-testing context, particularly when DNA technology has time and again proven factual innocence. *See Harvey v. Horan*, 285 F.3d 298, 305-06 (4th Cir. 2002) (Luttig, J., respecting the denial of rehearing en banc); Br. of Texas Exonerees 4, *Reed*, 598 U.S. 230 (No. 21-442).

The CCA's exoneration inquiry also excludes posttrial factual developments discrediting trial evidence. *See* ROA.296. That means that recanted or scientifically disproven trial testimony can foreclose DNA testing. That

makes no more sense than allowing states to rely on false evidence—which due process prohibits. *Supra* p. 6.

**b.** Reed's case highlights how unfair the CCA's construction of the exoneration inquiry is. Postconviction developments have seriously undermined the state's theory of the case and inculpated Fennell, and the state has retracted key forensic testimony. *Supra* pp. 2-3. DNA testing could prove Reed's innocence, but Article 64 arbitrarily prevents that.

> **3.** **The unreasonable-delay requirement violates due process because it punishes prisoners for exercising their rights and for not predicting changes in the law.**

Article 64's unreasonable-delay requirement violates due process, too. That provision requires the prisoner to "establish[]" that "the request for the proposed DNA testing is not made to unreasonably delay the execution." Tex. Code Crim. Proc. art. 64.03(a)(2)(B).

**a.** Under the CCA's interpretation, the unreasonable-delay requirement permits a finding that a prisoner requested DNA testing for an improper purpose just because he previously litigated his innocence based on other evidence. *See* ROA.303-306. But it's fundamentally unfair to punish a prisoner for exercising his legal rights. *E.g.*, *Doyle v. Ohio*, 426 U.S. 610, 619-20 (1976). And this requirement is particularly perverse where, as here, the

reason for the alleged "delay" is the prisoner's development of evidence to prove innocence. Thus, not only does the requirement punish prisoners for exercising their rights, but it also uses the time required to develop evidence of innocence to shut down the right to prove innocence in the first place.

**b.** The CCA also construes the unreasonable-delay requirement to impose an unfair hindsight requirement. Article 64 was amended in 2011 to permit DNA testing of "skin tissue or cells, fingernail scrapings," thus capturing types of biological material suitable for touch-DNA testing. Tex. Code Crim. Proc. art. 64.01(a)(1) (2011). But in the CCA's view, even though there was no indication that touch-DNA testing was available under Article 64 before 2011, Reed should have requested testing sooner. ROA.306-307. Denying testing because a prisoner couldn't anticipate that a legislature would amend a statute is fundamentally unfair. Indeed, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

**C.     Holding Article 64's non-contamination requirement unconstitutional would redress Reed's injury, even if no other provision of Article 64 violates due process.**

Article 64's non-contamination, exoneration, and unreasonable-delay requirements "each violate due process," Reed Suppl. Br. 30-31, and Reed

doesn't need to win on all three to obtain relief, Oral Arg. 2:35-6:49. The panel erred in holding otherwise. Op. 10-11 & n.7. Reed can prevail if only the non-contamination requirement violates due process.

A declaratory judgment that that requirement is unconstitutional "would eliminate the state prosecutor's justification for denying DNA testing." *Reed*, 598 U.S. at 234. It thus would result in "'a significant increase in the likelihood' that the state prosecutor would" allow testing. *Id*. And, at the motion-to-dismiss stage, the Court must "draw all reasonable inferences in favor of the nonmoving party." *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021). Doing so precludes the Court from assuming that Reed's DNA-testing request would be denied based on the exoneration or unreasonable-delay requirements.

> **1.    If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the exoneration requirement to deny testing of the murder weapon.**

Goertz couldn't rely on Article 64's exoneration requirement to deny testing of the belt.

Accepting the CCA's narrow construction of Article 64, *see* ROA.296, results showing a high concentration of another person's DNA on the belt would be highly exculpatory. The killer applied "a great force" to the belt

for "three to four minutes." *Reed*, 271 S.W.3d at 705-06. Finding a high con-centration of someone else's DNA on the belt (like Fennell's), but not Reed's, *would* exclude Reed as the killer-donor, and thus would satisfy Article 64's exoneration requirement. Thus, on a motion to dismiss, this Court cannot assume that Goertz would deny Reed's renewed request to DNA-test the murder weapon based on the exoneration requirement.

Nor could Goertz rely on the CCA's exoneration inquiry on Reed's 2014 Article 64 motion to deny testing of the belt. That decision excluded the belt only on the basis of the non-contamination requirement, and thus never conducted an exoneration analysis on the belt. *See* ROA.286-88; Oral Arg. 2:45-3:17, 6:35-6:50.

> **2.    If the Court finds the non-contamination requirement unconstitutional, Goertz cannot rely on the unreasonable-delay requirement to deny testing of the murder weapon.**

Goertz couldn't rely on Article 64's unreasonable-delay requirement to deny testing because that requirement is motion-specific.

The "unreasonabl[e] delay" inquiry "consider[s] the circumstances surrounding the request," including "the promptness of the request, the temporal proximity between the request and the sentence's execution, or the

ability to request the testing earlier." ROA.304. This assessment is "inherently fact-specific and subjective." *Id.* Here, the CCA concluded, based on "the totality of circumstances surrounding Reed's [2014] motion," that Reed was "unable to establish" "that his motion was not made for the purpose of delay." ROA.307. In particular, the CCA noted that that motion "was filed on the same day the judge heard the State's motion to set an execution date" and included a "request to test a significant number of items," including some "whose relevance to the crime are unknown." ROA.304-06.

Putting aside Reed's disagreement with those factbound conclusions, the CCA's analysis makes clear that Reed could show he had not unreasonably delayed when renewing his request for DNA testing and focusing only on the murder weapon. The CCA's previous unreasonable-delay analysis would not control on a renewed DNA-testing request, and the Court cannot assume—drawing all reasonable inferences in Reed's favor—that the request would be denied. *See* Oral Arg. 4:10-4:20. Indeed, Reed has been requesting testing of the belt since 1999, and the belt's "relevance to the crime" is not "unknown." ROA.304.

**CONCLUSION**

The Court should rehear the case en banc.

Dated: May 15, 2025          Respectfully submitted,

*/s/ Parker Rider-Longmaid*

Cliff Gardner                Parker Rider-Longmaid
Michelle L. Davis           *Counsel of Record*
SKADDEN, ARPS, SLATE,        Hanaa Khan
   MEAGHER & FLOM LLP      SKADDEN, ARPS, SLATE,
920 N. King St.                  MEAGHER & FLOM LLP
Wilmington, DE 19801       1440 New York Ave., NW
                             Washington, DC 20005
Barry C. Scheck            Telephone: 202-371-7000
Jane Pucher                 parker.rider-longmaid@skadden.com
THE INNOCENCE PROJECT
40 Worth St., Ste. 701
 New York, NY 10013        Jeremy Patashnik
                             Sarah Leitner
 Andrew F. MacRae       SKADDEN, ARPS, SLATE,
 MACRAE LAW FIRM PLLC    MEAGHER & FLOM LLP
 3267 Bee Cave Rd., Ste. 107,   One Manhattan West
   PMB 276                 New York, NY 10001
 Austin, TX 7846

*Counsel for Plaintiff-Appellant Rodney Reed*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g) and 40(d)(2), I hereby certify that (1) this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3) and Fifth Circuit Rule 40.2.5, because it contains 3,900 words, as calculated by Microsoft Word, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(f); and (2) this petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: May 15, 2025                 */s/ Parker Rider-Longmaid*
                                     Parker Rider-Longmaid

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2025, I electronically filed the foregoing petition and following opinion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: May 15, 2025                    */s/ Parker Rider-Longmaid*
                                       Parker Rider-Longmaid

**EXHIBIT A:**
**PANEL OPINION**

# United States Court of Appeals
# for the Fifth Circuit

—————————

No. 19-70022

—————————

United States Court of Appeals
Fifth Circuit

**FILED**

May 1, 2025

Lyle W. Cayce
Clerk

Rodney Reed,

*Plaintiff—Appellant,*

*versus*

Bryan Goertz, *Bastrop County District Attorney*; Steve McCraw, *Texas Department of Public Safety*; Sara Loucks, *Bastrop County District Clerk*; Maurice Cook, *Bastrop County Sheriff*,

*Defendants—Appellees.*

———————————————————

ON REMAND FROM
THE SUPREME COURT OF THE UNITED STATES

———————————————————

Before Elrod, *Chief Judge*, and Jones and Higginson, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

Rodney Reed challenges the constitutionality of Texas's postconviction DNA-testing procedures under the Due Process Clause of the Fourteenth Amendment. The first time we heard this case, we concluded that Reed's claim was time-barred in light of our precedent, *Reed v. Goertz*, 995 F.3d 425, 430–31 (5th Cir. 2021), but the Supreme Court reversed, *Reed v. Goertz*, 598 U.S. 230, 235–37 (2023). Turning now to the merits, we conclude that Reed has not pleaded a plausible due process violation because he has not shown that Texas's scheme is unfair or unjust in such a way that

it is fundamentally inadequate to vindicate the substantive right to postconviction DNA testing that it confers upon him. Accordingly, we AFFIRM the district court's dismissal of Reed's claim

I

A

Stacy Stites was murdered in 1996.[1] The same day that she was reported missing, her body was found on the side of the road in Bastrop County, Texas. She had been strangled with her own belt, part of which was found near her body. A truck that she shared with her fiancé, Jimmy Fennell, was later found in a parking lot, the other half of Stites's belt nearby. DNA testing matched intact sperm found in Stites's body to Rodney Reed. Reed was charged with Stites's murder. He defended himself on the theory that he and Stites had been carrying out an affair, that the two had engaged in consensual sex prior to Stites's murder, and that someone else—possibly Fennell—had killed her. The jury convicted Reed of capital murder and sentenced him to death.

Since his conviction, Reed has continued to press his innocence through myriad habeas petitions in state and federal court. *See Ex parte Reed*, 670 S.W.3d 689, 710–28 (Tex. Crim. App. 2023) (summarizing Reed's ten state habeas petitions); *Reed*, 995 F.3d at 427–29 (discussing our decision in *Reed v. Stephens*, 739 F.3d 753 (2014) (Reed's first federal habeas petition); *In re Reed*, No. 24-50529 (5th Cir. Nov. 5, 2024) (denying leave to file a second federal habeas petition). All of those petitions have been denied.

---

[1] We do not attempt to recite all of the facts of Reed's case here. For a much more thorough treatment, *see Ex parte Reed*, 670 S.W.3d 689, 699–743 (Tex. Crim. App. 2023).

In 2014, Reed moved in Texas state court under Chapter 64 of the Texas Code of Criminal Procedure for postconviction DNA testing of a number of items found near Stites's body and Fennell's truck. Notably, Reed filed this motion on the same day that his execution date was to be set. *Reed v. State*, 541 S.W.3d 759, 764 (Tex. Crim. App. 2017). Reed's motion sought DNA testing in the form of the new "touch DNA" technique, which can provide genetic information from those who have merely handled an item. *Id.* at 764–66. The state opposed the motion, arguing that it did not satisfy several elements of Chapter 64. *Id.* at 764, 766–77, 769.

The trial court denied Reed's motion, finding Chapter 64's requirements unsatisfied for several reasons. Some pieces of evidence, it concluded, had been "contaminated, tampered with, or altered." *Id.* at 769–70. It determined that there was "not a reasonable likelihood that any of the items Reed sought tested . . . contain[ed] biological material suitable for DNA testing." *Id.* at 770. None of Reed's identified evidence, even when considered altogether, showed that "he would not have been convicted in light of exculpatory results." *Id.* at 773. And that "Reed failed to meet his burden" of establishing that he had not brought his request for DNA testing to unreasonably delay his sentence. *Id.* at 777.

The Court of Criminal Appeals affirmed. *Id.* at 780. It disagreed with the trial court's determination that Reed's identified evidence did not contain biological material suitable for testing, but it agreed with the remainder of the lower court's reasons for denying the requested relief. *See id.* at 770, 780.

Reed filed this lawsuit, a 42 U.S.C. § 1983 action against Bastrop Country District Attorney Bryan Goertz, in August 2019. *Reed*, 995 F.3d at 428. Goertz moved to dismiss Reed's claims under Federal Rule of Civil Procedure 12(b)(6), the Western District of Texas obliged, and we affirmed,

reasoning that Reed's claims were time-barred under our binding precedent. *Id.* at 431 (applying *Russell v. Bd. of Trs.*, 968 F.2d 489, 493 (5th Cir. 1992)). The Supreme Court, however, disagreed, holding that "when a prisoner pursues state post-conviction DNA testing through the state-provided litigation process, the statute of limitations for a § 1983 procedural due process claim begins to run when the state litigation ends." *Reed*, 598 U.S. at 237. Thus, "the statute of limitations began to run when the Texas Court of Criminal Appeals denied Reed's motion for rehearing," and "Reed's § 1983 claim was timely." *Id.*[2]

Reed returned to our court and moved for leave to file supplemental briefing on the merits. We granted that motion, heard argument, and now consider the substance of his due process claim.[3]

## B

In Texas, individuals who wish to gain access to postconviction DNA testing have two methods of recourse available to them. Chapter 64 of the Texas Code of Criminal Procedure governs the first and gives Texas courts the ability to order such testing. *See State v. Patrick*, 86 S.W.3d 592, 595 (Tex.

---

[2] The Court also addressed three "threshold arguments," confirming that: (1) Reed has standing; (2) "the *Ex parte Young* doctrine allows suits like Reed's"; and (3) Reed's procedural due process claim does not offend the *Rooker–Feldman* doctrine. *Id.* at 234–35 (citing *Ex parte Young*, 209 U.S. 123 (1908); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Skinner v. Switzer*, 562 U.S. 521 (2011)).

[3] Reed's complaint identified five claims, alleging: (1) denial of due process; (2) impairment of his access to the courts; (3) cruel and unusual punishment; (4) denial of an opportunity to prove actual innocence; and (5) various violations of the Texas Constitution. Reed, however, has not continued to brief any claims other than his due process claim. And when asked at oral argument whether the remaining claims were still live, Reed's attorney conceded that they "rise and fall" with Reed's ability to show a due process violation. Thus, because we conclude that Reed has not stated a plausible due-process-violation claim, we need not address the remaining claims.

Crim. App. 2002). "A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence that has a reasonable likelihood of containing biological material."[4]  Tex. Code Crim. Proc. art. 64.01(a-1).  The state must have obtained the evidence "in relation to the offense that is the basis of the challenged conviction" and possessed it during trial.  *Id.* art. 64.01(b).  The evidence must not have been previously tested (or if it was, there exists a reasonable likelihood that a new testing technique will provide more accurate and probative results, or it was tested by a laboratory the Texas Forensic Science Commission found engaged in faulty testing practices that has since ceased conducting DNA testing).  *Id.*  And "identity" must have been or currently be "an issue in the case."  *Id.* art. 64.03(a)(1)(C).

Three of chapter 64's requirements are particularly relevant here. First, the court must find that the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect."  *Id.* art. 64.03(a)(1)(A)(ii). Second, the individual seeking testing must demonstrate that he "would not have been convicted if exculpatory results had been obtained through DNA testing."  *Id.* art. 64.03(a)(2)(A).  And third, that individual must show that he is not attempting to "unreasonably delay the execution of sentence or administration of justice."  *Id.* art. 64.03(a)(2)(B).

If all of these elements are met, "the court shall order that the requested forensic DNA testing be conducted."  *Id.* art. 64.03(c).  And unless

---

[4] In 2011, the Texas legislature amended Chapter 64 to include a definition of "biological material."  H.B. 1573, 82nd Leg. § 5 (2011); *see also Reed*, 541 S.W.3d at 779. The statute defines the term as "an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing."  Tex. Code Crim. Proc. art. 64.01(a)(1).

the evidence had previously been tested using "faulty testing practices," *see id.* art. 64.03(b-1), those conditions are necessary as well, *id.* art. 64.03(a).

Once the individual seeking DNA testing brings his Chapter 64 motion, the court must provide a copy of the motion to the state. *Id.* art. 64.02(a)(1). In response, the state must either "deliver the evidence to the court" or "explain in writing . . . why [it] cannot" within 60 days. *Id.* art. 64.02(a)(2). And after that period has run, the court may rule on the motion even if the state has failed to respond. *Id.* art. 64.02(b). Appeals of those rulings generally follow Texas's typical appellate course, but appeals by individuals sentenced to death go straight to the Texas Court of Criminal Appeals (CCA). *Id.* art. 64.05.

The second avenue by which an individual might gain access to postconviction DNA testing is through an agreement with the state. That is, a prosecutor may simply agree to perform the requested testing without court intervention. *See, e.g.*, *Skinner v. State*, 484 SW.3d 434, 436 (Tex. Crim. App. 2016). Such an agreement may be reached at any time, and without the burden of Chapter 64's strictures. *See, e.g.*, *Reed*, 541 S.W3d at 765 ("The State and Reed agreed to have [various pieces of evidence] tested outside of Chapter 64's parameters, and the judge entered an agreed order to that effect . . .."). As Goertz has put it, Chapter 64 "does not cabin a prosecutor's discretion" or otherwise "impose any requirements on a prosecutor" because her ability to issue testing is found in "a plenary common law privilege that the Court of Criminal Appeals has recognized." Prosecutors may, however, rely on Chapter 64 and a movant's inability to satisfy its requirements as a reason for declining or opposing testing.[5]

---

[5] Indeed, the Supreme Court reasoned that Reed has standing to bring this case because of his allegation that Goertz "denied access to the [requested] evidence,"

II

A

We review a district court's grant of a motion to dismiss *de novo*. *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 963 (5th Cir. 2019). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We accept all facts as pleaded and construe them in "the light most favorable to the plaintiff." *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017).

B

Reed complains that Chapter 64 is unconstitutional both facially and as applied to him. "Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' *United States v. Salerno*, 481 U.S. 739, 745 (1987) or show that the law lacks 'a plainly legitimate sweep,' *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (alteration in original). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745; *see also id.* (noting that facial-challenge plaintiffs "shoulder [a] heavy burden").

In adjudicating Reed's as-applied challenge, we consider "the particularities of [his] circumstances," *United States v. Giglio*, 126 F.4th 1039, 1045 (5th Cir. 2025) to determine whether Chapter 64 can be constitutionally applied to him, *see Citizens United v. FEC*, 558 U.S. 310, 331

---

"thereby caused [his] injury," and would not be justified in denying DNA testing if a federal court held Chapter 64 unconstitutional. *Reed*, 598 U.S. at 234.

(2010) (noting that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."). That is, we look not just at the contours of the rule at issue and the liberty it supposedly offends, but also to the facts relevant to either or both.

## C

To plead a violation of his due process rights, Reed must show that Goertz deprived him of a constitutional right while acting under color of state law. *Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010). "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. But process itself is not a protectable end. *Dist. Atty's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 67 (2009). Rather, for the Due Process Clause to attach and its protections to obtain, a plaintiff must identify a protected "liberty interest." *Id.*

The Constitution does not recognize a "freestanding right to DNA evidence." *Id.* at 72; *see also Skinner*, 562 U.S. at 525 ("*Osborne* rejected the extension of substantive due process to this area . . ..."). But the states, as policymakers, may nevertheless elect to confer such a right in its citizens. *Osborne*, 557 U.S. at 56, 67–68; *see also Wolff v. McDonnell*, 418 U.S. 539, 556–58 (1974) ("We think a person's liberty is equally protected [by the Due Process Clause], even when the liberty itself is a statutory creation of the State."). These "state-created right[s] can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981). Thus, if we determine that the Due Process Clause applies, we must then consider what process is due. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

"The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 558. In this context, this

means that the Due Process Clause guarantees that state-created rights, once created, are "not arbitrarily abrogated." *Id.* at 557. But at the same time, states have "flexibility in deciding what procedures are needed" when they choose to extend "help to those seeking relief from convictions." *Osborne*, 557 U.S. at 69. In other words, "due process does not 'dictate the exact form such assistance must assume.'" *Id.* (alteration adopted) (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987)). "The dilemma is how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice." *Id.* at 62. But the Supreme Court has clearly instructed that the task of solving this dilemma "belongs primarily to the legislature." *Id.*

These principles in mind, we must decide "whether consideration of [Reed]'s claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fairness in operation.'" *Id.* at 69 (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)); *see also Jauch v. Choctaw Cnty.*, 874 F.3d 425, 431 (5th Cir. 2017) (explaining that *Medina*, not *Mathews v. Eldridge*, 424 U.S. 319 (1976), supplies the correct framework for assessing the constitutionality of state criminal procedure rules (citing *Kaley v. United States*, 571 U.S. 320, 334 (2014))). Put differently, we "may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69.

These strictures "le[ave] slim room for the prisoner to show that the governing state law denies him procedural due process." *Skinner*, 562 U.S. at 525.

9

III

Turning now to the merits of Reed's arguments, we conclude that the district court correctly granted Goertz's motion to dismiss because Reed has not shown that the process Chapter 64 offers is "fundamentally inadequate to vindicate the substantive rights" it provides.  *See Osborne*, 557 U.S. at 69.

Reed seeks a declaratory judgment that Chapter 64 of the Texas Code of Criminal Procedure violates the Due Process Clause of the Fourteenth Amendment.[6]  He levies three due process attacks against Chapter 64.  First, he argues that the Texas Court of Criminal Appeals has "unfair[ly]" grafted a "non-contamination" requirement onto Chapter 64's "chain-of-custody" requirement that "bars prisoners from accessing DNA testing . . . based on the state's own insufficient procedures."  Second, he decries Chapter 64's exoneration requirement "because it excludes consideration of" evidence that might "inculpat[e] a third party."  And third, Reed maintains that Chapter 64's no-unreasonable-delay requirement "arbitrarily punishes prisoners for litigating their innocence and requires them to have predicted that a new technology, touch-DNA testing, was available before [Chapter] 64 or the CCA said it was."

Addressing each in turn, we conclude that none of these requirements are fundamentally inadequate to Reed's right to postconviction DNA testing either on their face or as applied to him.  And because he would have to show

---

[6] Goertz does not dispute that he acts pursuant to state law, *Kovacic*, 628 F.3d at 213, or that Chapter 64 of the Texas Code of Criminal Procedure extends a right to post-conviction DNA testing to which the Due Process Clause attaches, *Emerson v. Thaler*, 544 F. App'x 325, 327–28 (5th Cir. 2013).

that all three meet that definition to obtain his requested relief,[7] *a fortiori*, we conclude that the district court correctly granted Goertz's motion to dismiss.

## A

Reed's first argument concerns what he calls an "extratextual non-contamination requirement."[8] This aspect of Chapter 64, he says, "is fundamentally unfair and violates due process because it (a) breaks promises Texas postconviction law makes to prisoners seeking to prove their innocence; (b) ignores reliability concerns produced by the prosecution; and (c) arbitrarily applies a different standard to inmates and prosecutors." But these arguments, operating at a very high level of generality, do not convincingly fit this requirement into the "slim" space provided for actions challenging state postconviction DNA testing schemes.[9] *See Skinner*, 562 U.S. at 525.

---

[7] As discussed above, article 64.03 provides that the state court adjudicating a motion for postconviction DNA testing may order that testing "only if" all of its requirements are met. Tex. Code Crim. Proc. 64.03(a). Thus, so long as Reed fails to satisfy at least one requirement that passes constitutional muster, that court would remain statutorily required to deny testing.

[8] Reed does not cite a single case (from the Court of Criminal Appeals or otherwise) for the proposition that the Texas courts have appended some additional, "extratextual" stricture to Chapter 64's chain-of-custody requirement. The high criminal court did use the word "contaminated" in adjudicating this aspect of Reed's postconviction-testing motion. *See Reed*, 541 SW.3d at 769–70. But it does not appear that, by using that term, the court held Reed to some standard other than what is plainly required by Article 64.03(a)(1)(A)(ii). Nor does it appear that, in any event, this matters. *See Skinner*, 562 U.S. at 532 (blessing a challenge to the CCA's "authoritative[] constru[ction]" of Chapter 64); *Wood v. Patton*, 130 F.4th 516, 519 & n.5 (5th Cir. Mar. 7, 2025) (same).

[9] Goertz also argues that Reed forfeited this argument below. But Reed argued before the district court that Chapter 64 "places an impossible burden on applicants with respect to evidence *over which they have no control*." This is the exact argument that he makes on appeal.

Reed first argues that the "non-contamination" requirement reneges on Texas's promise of providing post-conviction DNA testing because it makes that option hinge on "the state's own handling and storage of evidence." It is "fundamentally unfair," he asserts, to foreclose testing due to deficiencies on the part of the state, especially "because DNA testing can yield highly probative information even where crime-scene evidence was supposedly contaminated . . .."

Putting aside the fact that Reed cites no caselaw for this proposition, it seems both inevitable and necessary that the state be tasked with storing evidence and that contaminated evidence, regardless of fault, be treated with increased scrutiny. It is not lost on us that this system might sometimes disadvantage individuals like Reed through no fault of their own. But the process this system offers is not arbitrary. Someone must maintain custody of potentially exculpatory evidence, and it is hard to imagine this someone being anyone other than the government. Pair all that with the reality that at least some mishandling of evidence is inevitable, and you end up with a government-run system that, at least sometimes, yields evidence that has been "contaminated, tampered with, or altered" in some way. *See Reed*, 541 S.W.3d at 769. And because we afford government actors a presumption of good faith in the exercise of their official duties, *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009), we do not think that entrusting this responsibility to the government is fundamentally unfair on its face.

All of this does not mean that individuals who draw such a short straw will be without recourse. It might very well be the case that an individual who shows that the state mishandled his evidence, by rebutting the presumption of good faith, would have a viable due process claim. But absent some showing of bad faith or bad conduct, we cannot see how committing the custody of potentially exculpatory evidence to the state is fundamentally inadequate to vindicate the right to the possibility of postconviction testing

that it offers—especially given the Supreme Court's emphasis that the power to define these contours is vested in the state legislature. *See Osborne*, 557 U.S. at 62. And because Reed does not make such a showing, he has not shown that the so-called "non-contamination" requirement renders Chapter 64 fundamentally inadequate as applied to him.

The remainder of Reed's "non-contamination" arguments fare no better. First, he complains that Chapter 64 places the chain-of-custody burden on him, "hold[ing] supposed contamination against the prisoner even though the state is responsible for the condition of the evidence . . .." But Reed's claim "must be analyzed in light of the fact that he has already been found guilty at a fair trial." *Id.* at 69. "Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears," *Herrera v. Collins*, 506 U.S. 390, 399 (1993), and the state is then justified in placing certain burdens on the convicted individual, *Osborne*, 557 U.S. at 68–69. Under this framework, the Supreme Court approved of Alaska's postconviction-DNA-testing scheme, which places a clear-and-convicing burden on the person seeking testing. *Id.* at 68. Failing to even attempt to distinguish the Alaska statute, Reed does not demonstrate why a different result should obtain here.

Next, Reed argues that "law enforcement procedures" might themselves "cause grave reliability concerns at the defendant's expense." He attempts to draw an analogy to due process prohibitions on the prosecution's use of false evidence or testimony, *see Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959) and "unnecessarily suggestive identification procedure[s]," *see Perry v. New Hampshire*, 565 U.S. 228, 241 (2012). But these comparisons fail because the analogy is simply too general to be convincing. Not only so, but they also ignore the fact just discussed that postconviction relief procedures are not held to as strict a standard as trial

procedures when challenged for supposed violations of due process. *Osborne*, 557 U.S. at 69.

Reed cites to us the Supreme Court's reminder in *Perry* that a "primary aim" of our due process rules "is to deter law enforcement use of improper [procedures] in the first place." *Perry*, 565 U.S. at 241. But the very next line in *Perry* belies Reed's argument: "This deterrence rationale is inapposite in cases . . . where there is no improper police conduct." *Id.* Reed might disagree with the state's handling of evidence, and we might know better now than we did then about how to do it. But none of this means that Chapter 64, as written or construed, is "fundamentally inadequate" to vindicate an individual's right to postconviction DNA testing. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (recognizing that the Due Process Clause is not violated when "there [is] no suggestion of bad faith" and law enforcement conduct "can at worst be described as negligent").

Last, Reed complains that the "non-contamination requirement unfairly imposes a more stringent chain-of-custody burden on inmates . . . than on prosecutors . . . at trial." But for the same reasons discussed above, it is unclear how this violates procedural due process when there is no requirement that postconviction relief procedures be held to the same standards as procedures at trial. *Osborne*, 557 U.S. at 69. It is true, as Reed points out, that we have interpreted the chain of custody requirement contained within the federal DNA-testing statute, *see* 18 U.S.C. § 3600(a)(4), to *not* impose a more exacting standard than that imposed at trial. *United States v. Fasano*, 577 F.3d 572, 576 (5th Cir. 2009). But *Fasano* is a case turning on statutory interpretation, not on the strictures of procedural due process. That this court has interpreted the *federal* DNA-testing statute one way does not mean that a state court interpreting a *state* DNA-testing statute a different way results in a state procedure that violates due process.

Thus, Reed does not demonstrate that article 64.03(a)(1)(A)(ii) is fundamentally inadequate to vindicate his right to postconviction DNA testing. It is not enough to disagree with how the state has elected to use its permissible discretion or to complain that it has misapplied its own standards. Instead, Reed would have to show that those standards are fundamentally unfair or unjust in some way, but he has simply failed to do so.

### B

Reed next challenges Chapter 64's exculpatory-results requirement. He argues that "the CCA's construction of the exoneration inquiry prevents an inmate from obtaining DNA testing that, together with posttrial developments, can show his innocence by inculpating a third party."

Reed's first issue concerns the CCA's interpretation of article 64.03(a)(2)(A). The statute requires the individual seeking testing to show that he "would not have been convicted if exculpatory results had been obtained through DNA testing." Tex. Code Crim. Proc. art. 64.03(a)(2)(A). And the CCA has interpreted "exculpatory results" to mean "only results excluding the convicted person as the donor of" the biological material at issue. *Reed*, 541 S.W.3d at 774 (quoting *Holberg v. State*, 425 S.W.3d 282, 287 (Tex. Crim. App. 2014)). To Reed, this interpretation is fundamentally unfair because it precludes testing of material that might exculpate the convicted individual by "fail[ing] to exclude another suspect."

We disagree. This exoneration requirement exists to ensure that the "DNA tests will prove a convicted person's innocence" and not "merely muddy the waters." *Kutzner v. State*, 75 S.W.3d 427, 438, n27 (Tex. Crim. App. 2002). Because evidence that "fails to exclude another suspect" does not necessarily fall into the former category, we cannot say that this requirement is fundamentally unfair. To start, *Osborne* approved of materiality requirements, recognizing both that they are "common" features

of DNA-testing schemes and that "they are not inconsistent with the 'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness.'" *Osborne*, 557 U.S. at 63, 70 (quoting *Medina*, 505 U.S. at 446, 448). But Reed's proposed rule runs headlong into this blessing. He argues, essentially, that due process requires the state to test evidence on the mere allegation that someone else's DNA might also be identified. But as Goertz puts it, "if the CCA were required to presume another suspect's DNA was on every piece of evidence," it would be "hard to imagine a case in which [it] would not grant DNA testing." *State v. Swearingen*, 424 S.W.3d 32, 39 (Tex. Crim. App. 2014). Reed's argument that it is unconstitutional to require the evidence to exculpate the movant therefore contravenes *Osborne*. Said differently, if Reed is correct, there would be no room for the materiality requirements the Supreme Court has already said are permissible. Accordingly, we cannot agree with him that due process requires the state to test evidence that would not demonstrate a reasonable probability of innocence.

Not only so, the facts of Reed's own case belie both his facial and as-applied challenge. The whole premise of Reed's claim is that favorable results "would fail to exclude" Fennell, his proffered suspect. But even if Fennell's DNA was found on the items for which Reed sought testing, that finding would show nothing more than the fact that Fennell drove his own truck or had touched his fiancé's belt. *See Reed*, 541 S.W.3d at 773–77. It can hardly be said that these results would be exculpatory. Thus, it does not seem arbitrary or fundamentally unfair to deny Reed testing under Chapter 64's exculpatory-results requirement, so we conclude that this requirement neither violates the Due Process Clause facially or as applied to Reed.

As somewhat of an afterthought, Reed also criticizes the CCA's requirement that the exoneration inquiry exclude consideration of posttrial factual developments. He cites *Holmes v. South Carolina*, 547 U.S. 319, 327

(2006) for the proposition that evidence "that someone else committed the crime" is generally admissible.  And he points to *Chambers v. Mississippi*, 410 U.S. 284, 301 (1973) to demonstrate that he has a "fundamental right" to present that sort of evidence.  But again, these arguments discount the fact that the Due Process Clause requires much less of postconviction procedures than of preconviction ones.  *Osborne*, 557 U.S. at 69.  Not only so, but a holding that due process forces states to augment the trial record would be inconsistent with well-established precedent in other contexts.  For example, direct appeals are generally limited to the record developed at trial.  *See, e.g.*, *Trevino v. Thaler*, 569 U.S. 413, 422 (2013).  And the same is true for federal habeas review.  *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).  If due process permits of such a limitation in the federal courts, "the Due Process Clause of the Fourteenth Amendment cannot possibly require more of a state court system."  *See Smith v. Phillips*, 455 U.S. 209, 218 (1982).

Accordingly, we conclude that the CCA's interpretation of article 64.03(a)(2)(A) is not fundamentally inadequate to vindicate postconviction-DNA-testing rights whether on its face or as applied to Reed.

## C

Finally, Reed urges that the CCA's interpretation of Chapter 64's diligence requirement violates due process because it (1) "arbitrarily punishes prisoners for developing evidence of innocence and (2) "prevent[s] any prisoner seeking touch-DNA testing after the 2011 amendments from obtaining testing."[10]  But we cannot tell that either is true.  *See Reed*, 541

---

[10] Goertz also argues that Reed forfeited this argument.  Reed only briefed his due process claim before us, even conceding at oral argument that his remaining claims "rise and fall" with his ability to show a due process claim.  Because Reed argues only the due process claim on appeal, he has forfeited all other claims.  *See United States v. Joseph*, 102 F.4th 686, 691 (5th Cir. 2024) (quoting *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th

S.W.3d at 778 (stating "Article 64.03(a)(2)(B) does not contain set criteria a court must consider" in making this determination; such determinations are an "inherently fact-specific and subjective inquiry" for which there is no "definitive criteria."). Similarly, in *Osborne*, the state law at issue required a showing that the requested DNA evidence was newly available, *diligently pursued*, and sufficiently material. *Osborne*, 557 U.S. at 70.

To evidence his first argument, Reed cites nothing other than the CCA's opinion in his own case. But even then, it is less than clear that the court "punish[ed] [him] for exercising his legal rights." To the contrary, it considered (1) Reed's ""'piecemeal approach' in his post-conviction litigation," (2) Reed's failure to seek a testing agreement until we denied him a certificate of appealability, (3) that "he took four months" to facilitate the execution of that agreement, and (4) that Reed filed his motion "on the same day the judge heard the State's motion to set an execution date filed three months earlier." *Reed*, 541 S.W.3d at 777–79; *see also id.* at 777–78 (enumerating the trial court's seven reasons for denying testing). To put it simply, the CCA's application of the law hardly seems arbitrary, and it certainly gives no indication that it has or would "punish" any other postconviction-DNA-testing applicant. Because Reed has not shown a fundamentally unfair application of the law in his case (much less facially), we disagree with his contention that the no-undue-delay provision offends due process. *See Wood*, 130 F.4th at 523 (rejecting similar challenge when challenger could not show that a certain factor was "dispositive (or even key) . . . in finding unreasonable delay").

---

Cir. 2021)) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal."); *see also* FED. R. APP. P. 28(a)(8)(A), (B).

Reed's second critique is no more persuasive. He argues that the CCA "construed the unreasonable-delay requirement to hold against prisoners any pre-2011 delay in seeking touch-DNA testing even though it wasn't clear that Article 64 allowed touch-DNA testing until the law was amended in 2011."[11] This construction, he urges, "punishes prisoners for not being fortunetellers." But the problem with Reed's argument is that he brings no evidence of such construction. *See Wood*, 130 F.4th at 523 ("*Reed* did not create a new rule; it restated the existing rule . . ..."). The CCA did note that Reed could have known of the possibility of his claim: "Chapter 64 had existed with only slight variations for over thirteen years at the time Reed filed his motion, and there does not appear to be any factual or legal impediments that prevented Reed from availing himself of post-conviction DNA testing earlier." *Reed*, 541 S.W.3d. at 779 (footnote omitted). Citing *Swearingen v. State*, 303 S.W.3d 728, 732–33 (Tex. Crim. App. 2017), the trial court reasoned that Reed could have known that "biological material" included touch DNA "at a much earlier time." *Id.*[12] But as we discussed above, this point was not dispositive as the CCA spent several pages discussing other reasons for its undue-delay finding. And does Reed identify any other example of a motion being denied on this basis. Thus, for much the same reasons, Reed has not shown a due process violation here either.

---

[11] As Reed helpfully explains, the 2011 amendment added "skin tissue or cells," "fingernail scrapings," and "other identifiable biological evidence that may be suitable for forensic DNA testing" to the definition of "biological material," "thus capturing types of biological material suitable for touch-DNA testing." *See supra* at note 4.

[12] The trial court noted on the record that Reed's attorney at the time was also counsel for the movant in the *Swearingen* case.

IV

The question we face today is whether Chapter 64 of Texas's Code of Criminal Procedure "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fairness in operation'" such that it is "fundamentally inadequate to vindicate" the right to postconviction DNA testing that it provides. *See Osborne*, 557 U.S. at 69 (quoting *Medina*, 505 U.S. at 446, 448).  As we have drawn out, we conclude that it does not.  Reed, therefore, has not stated a claim upon which relief could be granted, and the district court correctly granted Goertz's motion to dismiss for that reason. We AFFIRM.